

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-74,391

### PERRY EUGENE WILLIAMS, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM HARRIS COUNTY

KELLER, P.J., delivered the opinion of the Court in which WOMACK, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., joined. MEYERS, J., filed a dissenting opinion. PRICE, J., filed a concurring opinion. JOHNSON, J., filed a concurring and dissenting opinion.

In June 2002, appellant was convicted of capital murder and sentenced to death.[1] Direct appeal to this Court is automatic.[2] Appellant raises eleven points of error. Finding no reversible error, we affirm the conviction and sentence.

---

[1] TEX. PEN. CODE §19.03; TEX. CODE CRIM. PROC. art. 37.071. Unless otherwise indicated, all future references to articles refer to the Code of Criminal Procedure.

[2] Art. 37.071, §2(h).

## I. BACKGROUND

One of appellant's points of error involves a challenge to the sufficiency of the evidence to support the jury's determination of future dangerousness, while another point of error, relating to the admission of victim impact and character evidence, will require us to perform an extensive harm analysis. Consequently, we engage in a comprehensive discussion of the evidence relevant to appellant's punishment.

### A. The Crime Spree

The offense for which appellant was convicted occurred during the middle of a crime spree. The State presented no evidence that appellant had engaged in any violent conduct before the crime spree began.

On September 9, 2000, appellant was driving in his car with a female friend, Kinita Starr Butler, who had a handgun. Upon seeing Lolita Cherry and Nicole Green walking down the street, appellant drove by and parked a short distance in front of them. Appellant got out of his car, grabbed Cherry, placed the handgun to her head, and demanded her purse. After getting the purse, Butler searched through it and told appellant, "This bitch don't got no money." Appellant turned Cherry around to face him and shot her in the breast. Appellant then jumped into his car and drove away. Cherry was taken to the hospital, where the wound was determined to be "superficial." The bullet had entered and exited her breast and was not recovered. Cherry was permitted to leave the hospital the next morning. During his testimony at the punishment phase of trial, appellant claimed that his shooting was intended only to scare Cherry, not to hit her, and that he did not realize at the time that she had actually been shot.

On September 17, 2000, appellant, his cousin James Dunn, Jr., and Butler were driving

around in appellant's car and picked up Corey Phillips. Butler had again brought her handgun, and the group proceeded to carry out four robberies that evening. First, they approached Anthony Gonzales in a Kroger parking lot. Appellant pointed the handgun at Gonzales's face and said, "Give me your car." Because Gonzales's car had a stick shift, appellant could not drive it and point the gun at Gonzales at the same time, so he ordered Gonzales to drive the car while he held the gun to Gonzales's ribs. Appellant took Gonzales's wallet and yanked two chains from his neck. Appellant also took Gonzales's ATM card and demanded the PIN number. Appellant kept Gonzales's driver's license in case Gonzales ever reported the robbery and they needed "somebody" to "take care of it." Appellant testified that this was done at Phillips's instruction. The group drove to an ATM machine, and appellant tried to use the ATM card to withdraw money, but the PIN number did not work. Appellant testified that Dunn urged him to try again, but appellant's efforts were not successful.

The group next approached Matthew Carter, the victim in this case. Carter had visited his girlfriend and fellow medical student, Maryam Saifi, to help her with a class project. Carter left Saifi's home around 11:00 p.m. to return a rented video to Blockbuster. The group drove into the Blockbuster parking lot and saw Carter returning to his car after returning the videotape. According to appellant's testimony at trial, Dunn was supposed to take the handgun and rob Carter as part of an initiation into an affiliate of the Crips gang, but Dunn "froze up." Phillips then handed appellant the gun and told him to "go get em." According to his testimony at trial, appellant "took the gun and took over." Appellant forced Carter at gunpoint into the passenger seat of Carter's car, and appellant got into the driver's seat. They then followed Phillips, who was driving appellant's vehicle. Carter told appellant numerous times that he had an ATM card that appellant could "max out," and he pleaded with appellant not to hurt him. Nevertheless, after parking the car, appellant shot Carter in

the head from close range. According to appellant's confession, Carter hit appellant and the gun fired. Forty dollars was taken out of Carter's wallet and distributed evenly among the four members of the group.

About an hour later, the group committed two more robberies. In the first of these robberies, Tomas Kooh and Ricardo Rubio were at a gas station when appellant and his companions drove up. Phillips pointed the handgun at both men and demanded their wallets. After Phillips took their wallets, appellant "burned off and got on the freeway." In the other robbery, Phillips approached Franklin Jackson, who had left the door of his motel room open after unloading his truck. As Jackson turned to close the door, Phillips pointed a gun at him and told him to get back. Jackson slammed the door as Phillips attempted to force his way in and a shot was fired as a result, causing a minor wound to Jackson's hand. Appellant was also the driver of the car in this robbery.

### B. Appellant's Incarceration

Upon arrest, appellant was incarcerated in the county jail's "kid tank," the section of the jail occupied by inmates who are under the age of twenty-two. During his time in the kid tank, appellant was disciplined four times for fighting, once for giving himself unauthorized tattoos, once for committing an assault and destroying county property, and once for stealing. The jail disciplinary reports contained information about these incidents, including statements made by appellant and other inmates involved.

The first incident occurred on October 25, 2000. The jail officer determined that appellant and another inmate were engaged in a mutual fight. In his statement, appellant claimed that the other inmate, Charles King, called him various insulting names and took away his newspaper. Appellant further claimed that this was not the only time that King had insulted him and there was only "so

much you can take." After making these comments, appellant said, "All I can say is I'm sorry for breaking the rules by fighting."

King claimed that he asked appellant for the comics section of the newspaper, but appellant said he was reading it. Seeing that appellant was reading only the metro section, King asked why appellant was acting that way. Appellant then replied, "Fuck you." King told appellant that he did not have to curse at him and appellant stood up as if he was going to hit King. King threatened to hit appellant back if appellant hit him, appellant swung at him, and they began to fight. Appellant told King that he did not care about fighting because he wanted to be moved out of the tank anyway.

On March 12, 2001, appellant and inmate Floyd Barnes were caught fighting. The record contains no statements from either of the inmates about this incident.

On April 22, 2001, appellant was found fighting with Wiley Williams. According to appellant, they started fighting when Williams insulted appellant's neighborhood. Appellant claimed that Williams threw the first punch and that appellant was only defending himself. Appellant concluded by saying, "I know I was wrong for fighting but I had to defend myself. I ask you to understand where I am coming from."

Williams claimed that he was sitting in a group engaging in friendly conversation when appellant "took the conversation to a whole different level" and "continuously tried to fight" him. He told appellant that he did not want to fight, but appellant kept advancing toward him. The other inmates left because they did not want to get into trouble. Appellant then hit Williams, who defended himself. Williams concluded by saying, "I feel this inmate had no reason to put his hands on me and I want to press charges."

On June 17, 2001, the jail authorities discovered that appellant had tattooing equipment in

his possession and that he had recently given himself tattoos. In his written statement regarding the matter appellant said, "I'll like to start by saying I am sorry for disobeying county rules. But I felt I was paying my cousin respect by getting his name tattooed on my arm since he passed away. I know it was wrong but all I can say once again I am sorry. But I didn't mean to cause so much trouble."

On June 23, 2001, appellant engaged in a fight that involved inmates David Bradford, Willie Jones, Hari Brown, and Quentin Rubin. In his statement, appellant claimed that he was not fighting but "was trying to break it up." All of the other disciplinary allegations against appellant during his jail stay ended with a plea agreement, but appellant contested this particular allegation and was found guilty.

On August 4, 2001, appellant walked up to inmate Curtis Vandver and grabbed and tore Vandver's shirt. Vandver appeared to be afraid of appellant and said that appellant did this for no reason at all. In his written statement, appellant claimed that he was just playing with Vandver and getting him back for something Vandver did to him. Appellant complained that he did not understand why he was getting written up for something like this, but he concluded his statement by saying, "I know it was wrong but all I can say is I was being a kid. I don't need to get into anymore trouble but I did so I don't know what else to say but I'm sorry for my childish actions. Please forgive me and give me a second chance."

Finally, on August 12, 2001, appellant was caught stealing property from another inmate. In his written statement, appellant indicated that other inmates were involved in the theft but he did not want the whole tank to get in trouble. He also asked for forgiveness.

While incarcerated, appellant wrote two letters to Butler. One of those letters was dated

February 11, 2001, and the other letter was not dated. Both contained comments at the end suggesting gang affiliation, including: "crip forever," "crip for life," and "blue over gray all day every day." During his testimony at the punishment phase of trial, appellant contended that he was just responding to similar statements made in Butler's letters, and he characterized his actions in doing so as "a youngster mistake."

In January of 2002, appellant was moved to the adult tank. At the punishment phase of trial, which occurred in June of 2002, a deputy sheriff testified that problems in kid tanks were not unusual, and appellant had not been a problem since he was placed in the adult tank.

Steve Martin, an expert on prisons,[3] testified about the environment of a maximum security prison, where appellant would stay if sentenced to life imprisonment. He also commented on appellant's jail disciplinary record, testifying that the imposition of relatively mild punishments in each case suggest that the infractions were not serious. He also testified that he expected to see minor fights more often in a tank of youthful offenders than a tank of older offenders. On cross-examination, Martin acknowledged that there are gangs, violence, and drugs in prison.

### C. Appellant's Mitigating Evidence Regarding Changes in His Character

Appellant's mother, Roberta Clay Williams, testified about various events in appellant's childhood, about what a good person his father was, and about some general background on other family members. She explained that appellant was born in Houston and the family lived there until 1991, when they moved to Mississippi. Appellant moved back to Houston in 2000 and stayed with Roberta's sister, Dinah Clay Morgan. Clifton Morgan, Dinah's husband, testified that appellant was

---

[3] Martin was a correctional officer, later obtained a law degree and worked as legal counsel in the Texas prison system, and eventually started a correctional consulting business.

"respectful" and "not violent" and Sandra Miller, a friend, also testified to appellant's "respectful" nature.

But Dinah told Roberta, and later testified at trial, that appellant began to change. He started hanging around the "wrong crowd," people Dinah did not approve of. Detra Clay, appellant's sister, also testified that appellant changed. She stated that appellant started drinking a lot and smoking marijuana, and she saw him pop a pill once. When he came to her home, he threw up "constantly" and "everywhere."

During his own testimony, appellant said his reasons for disregarding advice from family to stay out of trouble were "[m]e being saying I was grown and drug abuse and hanging around with the wrong crowd." Appellant claimed he had been using "PCP laced with marijuana."

When appellant's mother was asked whether he was responsible for his actions, she agreed that he was, but she also agreed that "hanging with the wrong crowd" mattered "[b]ecause he is not like this."

After appellant was incarcerated, a jail chaplain was referred to appellant by appellant's cousin Dunn, who was concerned about appellant's spiritual condition. The chaplain testified that when he met appellant he was pleasantly surprised to find a person who was "broken" and "repentant" and had "made his peace with God." The chaplain believed he had found "a real change" in appellant's life, but on cross-examination he conceded that he did not really know what appellant's life was like before meeting him.

During his punishment phase testimony appellant responded affirmatively when defense counsel asked whether, if he received a life sentence, he would follow the prison rules. He also responded that he would not be a problem for fellow inmates or prison staff.

### D. Appellant's Testimony Seeking to
### Convey Acceptance of Responsibility

During direct examination in the punishment phase, appellant made numerous statements indicating that he accepted responsibility for his actions during the crime spree. When asked whether the drugs he used were at fault for what happened, he replied, "No sir." "Whose fault is it?" the defense attorney asked. Appellant responded, "It's mine." When asked whether Carter was at fault for his death, appellant explained:

> It wasn't meant to or his fault that he died, it was mine. It was a bunch of things that was going on that I cannot explain. Don't know how to explain them.

> \*\*\*

> Is not that I won't explain, it's just the night everything happened we had been smoking PCP laced with marijuana. That's no excuse for what I did. I didn't intentionally kill Matthew Carter.

When appellant denied intentionally killing Carter, defense counsel questioned him about the actions he did intend that night, which included participating in the robbery, holding the gun, and cocking the gun. Appellant denied loading the gun – claiming that Phillips had done so – and he also stated that he did not know that the gun was loaded until the gun fired. When asked whether he knew a bullet was in the gun's chamber when Cherry was shot the week before, appellant responded, "Not necessarily speaking."

When asked how the shot was fired that killed Carter, appellant said, "In the process of him getting out of the car he walked around the car, I'm trying to see where he is coming from. I had, I had the gun, and something happened. I don't know what happened. Something physical happened and I tensed up and I pulled the trigger." When defense counsel asked, "Who was responsible for

what happened to Matthew Carter?" appellant replied, "I am."

Later, defense counsel asked some questions regarding what appellant had to say to his own mother and to the victim's family. With respect to his own mother, appellant replied, "Really ain't too much I can say. Only thing I can say is I'm sorry." With respect to the victim's family, appellant responded, "Only thing I can say is I'm sorry for the pain I caused in your heart by taking your son's life."

During cross-examination, the prosecutor began to question appellant about whether he was really accepting responsibility for his conduct:

Q. What we have here today right now is you sitting in front of this jury saying it's my fault, right?

A. Yes, ma'am.

Q. It's my responsibility, right?

A. Yes, ma'am.

Q. I accept your verdict, right?

A. Yes ma'am.

Q. Okay. But in reality that's not what you're saying, is it Mr. Williams?

A. That's what I'm saying.

Q. What you keep saying is Corey told me to do this. Corey told me to do this.

A. May I speak freely?

Q. Just answer my question. Are you telling me – have we not heard you say Corey told you to do it, right?

A. Yes, ma'am.

Q. So Corey is the big bad Corey that's in charge of this whole reign of terror, shall

we say, right?

A. Technically speaking, yes.

After further questions about Phillips being the leader of the group that night, the prosecutor asked appellant if he, Butler, and Dunn had originally planned to rob Phillips before they recognized him and he joined the group. Appellant responded, "[N]ot to my recollection. It's been so long I don't remember. I don't remember the biggest part of this whole situation."

When the prosecutor asked appellant whether the group had abducted Gonzales during the first robbery incident on September 17, 2000, appellant answered, "Yes, ma'am. I don't call it abducting." "What would you like to call it?" the prosecutor asked. Appellant replied, "Not being where no one can see you."

The prosecutor challenged appellant's contention that he was just following Phillips's orders as the Gonzales robbery progressed:

Q. So then in fact Corey is following you?

A. At this point in time, yes.

Q. All right. So you're calling the shots where we're going to here, right?

A. I don't put it like that.

Q. Well, you're telling Anthony where to go, right?

A. Technically speaking, yes.

The prosecutor questioned appellant about his actions after the Gonzales robbery – when he tried to withdraw money from an ATM machine. Appellant explained that withdrawing the money was Phillips's idea even though appellant was the one who had obtained the PIN number. After two unsuccessful attempts to use the card, appellant claimed that Dunn told him to try one more time.

Appellant said he really did not want to use the ATM machine because he knew the PIN number would be incorrect. The prosecutor asked, "You're the one that had the wherewithal, the good sense to ask Anthony, well, what is the pin number. Go along with this so this is not useless to me, right? You asked him that, right?" Appellant answered, "Technically speaking, yes."

The prosecutor subsequently questioned appellant about his dominant role in Carter's murder. The prosecutor elicited the testimony about Dunn being asked to commit a robbery in order to become a part of the Crips gang. "So Corey is here," the prosecutor said, "and in order to get with the gang you do it. James don't want to do it. Instead of putting up with the tomfoolery, give me the gun, I'll take care of business?" Appellant responded, "Technically speaking."

The prosecutor later asked appellant if, by the time he pulled the trigger on the gun in the Carter murder, he "actually kind of had a little bit of practice" the week before when he shot Cherry. Appellant replied, "I don't remember – everything happened so fast. I don't really remember that." Appellant did acknowledge that he never told the investigating detective about the Cherry shooting. When the prosecutor insinuated that appellant kept quiet about that incident because the detective did not indicate he knew, appellant responded, "To be honest, that slipped my mind from me getting high."

The prosecutor also questioned appellant about his contention that he was high during and after the murders. Appellant said that he did not go to sleep the night the murder occurred. He conceded that he showed up at 8:00 a.m. at his workplace (a U-Haul center) the morning after the murder and that he worked the entire eight-hour shift. Appellant contended that he was high the entire time.

Apparently displeased with appellant's answers during cross-examination, defense counsel,

on redirect, asked appellant about the "taking responsibility" issue:

> Q. I mean, you took the witness stand here today, you said it was your fault, wasn't Corey Phillip's [sic] fault, then you spent the whole cross telling us it was Corey Phillips.

> \* \* \*

> A. I'm not saying it's anyone's fault.

> Q. Sure you are.  You said it's my fault.

> A. It is my fault.

> Q. No, you didn't say that.  You spent the last 30 minutes telling these people it's Corey Phillip's [sic] fault.  I just want to know, you know, if Corey Phillips tells you to jump off a bridge, you jumping off a bridge?

> A. Not necessarily, no.

> \* \* \*

> Q. Why did you get up and say it's your fault, turned around and say it's not your fault?

> A. I didn't say.

> Q. Yes, you did.

> A. I didn't say – I didn't say it wasn't my fault.  What I said was – I took responsibility for taking the man's life, shooting Lolita Cherry, if that's how you pronounce the name, if I am not pronouncing it right.  I take responsibility for the biggest things that changed my life and changed the Carters' lives forever.

> \* \* \*

> Q. What do you mean you're talking technically speaking?  What does that mean, technically speaking?  What does that mean?

> A. That means yes just in a stronger way to the way I put it.

> Q. Okay.  Well, you know, can you see how that technically speaking does not sound right?

A. I just –

Q. Can you just see how that doesn't sound right?

A. Yes, sir.

Q. This isn't a technical case, is it?

A. Not really, sir.

Subsequently, defense counsel queried appellant about his performance on the witness stand:

Q. The judge asked you to take the witness stand, right?

A. Yes, sir.

Q. And he did swear you to tell the truth, right?

A. Yes, sir.

Q. And then she [the prosecutor] asked you to tell the truth. Remember she said just tell me the truth, right?

A. I told you the truth.

Q. Okay. I mean –

A. I told her the truth, even though that doesn't sound like it. I'm just, I'm just speaking. I'm nervous up here, being in the fate of my own, being to keep my own fate.

Q. You never testified before, have you?

A. No sir.

Finally, defense counsel questioned appellant about following someone else's bad judgment:

Q. Is this Corey Phillips – can you just march along to what anyone else tells you to do?

A. I don't know how to answer that question.

Q. Well, you know how to exercise free will. You know how to say yes, you know

how to say no?

A. Yes, sir.

Q. You know how to engage in conduct, you know how to not engage, right?

A. Yes, sir.

Q. You know how to say no?

A. Yes, sir.

Q. Right. Corey Phillips tells you to do something, you know how to say no, don't you?

A. Yes, sir.

### E. State's Victim-Impact and Victim-Character Evidence

### 1. Guilt Phase

Through Saifi, the State introduced some evidence about Carter's personal life. Saifi testified that she and Carter met as summer camp counselors and became involved in a serious dating relationship. After Carter graduated from college, he chose to attend medical school at the Baylor College of Medicine because Saifi was already attending there. Because Carter was an excellent student, he applied under the early-decision program and was accepted on a full scholarship. Saifi further testified that Carter's father was the chairman of the Neurology Department at Southwestern Medical School and that his mother was a social worker. All of this testimony was admitted without objection.

The State also presented testimony from Claire Bassett, the Vice President for Public Affairs at the Baylor College of Medicine. She testified that she knew Carter as a first-year medical student "because he was one of our top ten students." Defense counsel objected to this testimony. At a

bench conference, the trial judge sustained the objection. No instruction to disregard was requested or given. Bassett then testified that Carter was one of her medical students and she identified his picture. Defense counsel objected to Bassett identifying the picture, but that objection was overruled.

### 2. Punishment Phase

After the defense rested, the State called three witnesses to give victim-related testimony. Bassett testified that, because many of the medical students were upset by Carter's death, the medical school decided to permit students to delay taking exams if they so chose. The school also placed all of its psychiatric faculty at the disposal of the students for counseling, if needed.

Saifi testified that, with Carter's death, she lost her best friend, and this loss changed her life on a daily basis. She said that his death "really destroyed the future that Matt and I had planned for each other." She explained that she and Carter had planned to be married by the end of his first year in medical school and that his death destroyed their plans and their dreams:

> So, I lost you know, my husband that I would spend the rest of my life with and, uhm, the family we had dreamed about. We already discussed, apparently, how we wanted to raise our family, uhm, where we'd live so we'd be close to his family, close to my family. Uhm, they were definite plans that were interrupted and dreams that were destroyed.

She also explained that her position in medical school became jeopardized and that she took time off and received counseling.

Carter's father, Dr. Gregory Carter, also testified. Dr. Carter explained that he and his wife drove from Dallas to Houston the evening they learned of their son's murder. He described it as a "painful drive" with "a certain amount of disbelief . . . that this could be real, this could really happen." Dr. Carter described himself, his wife, their other son, and the students at the medical

school as "very upset." When asked about the impact his son's death had upon him, Dr. Carter said it was "devastating." He lost a "considerable amount of work" and "had difficulty keeping up subsequent to that."

Dr. Carter also explained that his wife had been making really good progress on her career before their son's death, but afterwards, she was unable to work full time and had become "markedly disabled with depression." Not only did she suffer from "depression and grief," however, but a few months later "she developed an attack of multiple sclerosis."

Dr. Carter testified that the grief of losing Carter was mitigated somewhat by the happy event of their other son's new marriage. But when Carter's birthday approached, the memories came back. His absence was a "major rip or hole in the fabric" of the family, and the victim's brother in particular felt "like a hunk had been taken out of his heart." Dr. Carter also extolled the victim as a good person of whom his parents were very proud: "You know, you raise a child up to be right with God, right with your family and right with their community, and Matthew was a shining example of all that. We were so proud of him and so proud of all that he had done and all that he had accomplished and what kind of person he was." Dr. Carter testified that the painful memories were also brought back in August 2001 when his father (the victim's grandfather) died of natural causes and then again on September 18 "when we saw on the news again and again the families that suffered those sudden and violent losses of their loved ones" during the terrorist attacks on September 11, 2001.

The next day, defense counsel sought to introduce a "bystander's bill" to reflect Dr. Carter's demeanor during his testimony. Defense counsel contended that Dr. Carter "had to stop while he was crying several times in talking about his wife and his son." One of the prosecutors expressed

disagreement with defense counsel's characterization of Dr. Carter's demeanor. The prosecutor stated, "Doctor Carter, if he paused at all was very brief in nature. There were a couple of times I guess I would refer to it as his voice broke but he did not sob." The trial judge did not comment on these contrasting views of the testimony.

## II. ANALYSIS

### A. Sufficiency of the Evidence – Future Dangerousness

### 1. *Legal Sufficiency*

In point of error eight, appellant contends that the evidence was legally insufficient to support the jury's affirmative answer to the "future dangerousness" special issue.[4] When reviewing the legal sufficiency of the evidence to support the jury's answer to this special issue, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have believed beyond a reasonable doubt there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.[5]

In response to appellant's claim, we observe that appellant shot not just one person, but two, and those shootings occurred on different occasions. He participated in at least five robberies, two of which were after Carter's murder. With regard to the shooting of Cherry, the jury could rationally believe that appellant intended to kill her, or at least did not care whether she lived or died. The jury also had evidence that appellant intentionally killed Carter despite his pleas for mercy and despite his offer to allow appellant to withdraw money with his ATM card.

---

[4] The issue asks "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Art. 37.071, §2(b)(1).

[5] *Russeau v. State*, 171 S.W.3d 871, 878 (Tex. Crim. App. 2005).

The jury was also entitled to disbelieve appellant's claim that Phillips was the leader of the group and believe, instead, that appellant was the leader. Appellant had robbed Cherry without Phillips, and the jury could have rationally believed that appellant intended to rob Phillips before recognizing him. The jury could consider the fact that appellant personally abducted two different robbery victims and robbed them while he was alone with them in their own cars.[6]

In addition, there was evidence that Carter's murder was gang-related, that appellant was associated with the Crips gang, and indeed, that appellant was still associated with the Crips gang while he was incarcerated on the capital murder charges. The jury could believe that he would continue to be a gang member in prison and thus pose a danger to other inmates and prison staff.

Moreover, the jury could have rationally believed that appellant's continued gang membership showed that he was not in fact repentant about his criminal activities. Likewise, the jury could have viewed appellant's disciplinary record as evidence that he had not reformed after getting caught.[7] Indeed, the jury could have believed that appellant instigated all or most of the fights for which he was disciplined. Finally, various aspects of appellant's trial testimony – his claim that Phillips was the leader, his use of the words "technically speaking" to describe his blame or involvement, his claim that the crime was committed under the influence of drugs, and his attempts to minimize the severity of his motives and actions – could be viewed as indicating that appellant's acceptance of responsibility was not genuine.

We also observe that the jury could believe that appellant's drug use made him dangerous,

---

[6] *See Cockrum v. State*, 758 S.W.2d 577, 593 (Tex. Crim. App. 1988)(defendant's dominant role in capital murder is evidence of future dangerousness).

[7] *Cf. Reese v. State*, 33 S.W.3d 238, 247 (Tex. Crim. App. 2000)(it was in capital defendant's best interest to behave well in jail awaiting trial).

and there was evidence that drugs can be found in prison.[8]

The evidence was legally sufficient to support the jury's affirmative answer to the future dangerousness special issue.[9] Point of error eight is overruled.

### 2. *Factual Sufficiency*

In point of error nine, appellant argues that the evidence is factually insufficient to support the jury's affirmative answer to the "future dangerousness" special issue. We have consistently declined to conduct a factual-sufficiency review in this context.[10] Point of error nine is overruled.

### B. Indictment's Failure to Allege Special Issues

In point of error eleven, appellant contends that the indictment did not authorize the imposition of the death penalty because it did not include an allegation conforming to the future dangerousness special issue. He relies upon *Apprendi v. New Jersey*.[11] We have previously decided this claim adversely to appellant's position.[12] Point of error eleven is overruled.

### C. Waiver of the Mitigation Special Issue / Victim Impact and Character Evidence

Points of error one through three address victim-impact and victim-character evidence[13] and

---

[8] *Wilkerson v. State*, 881 S.W.2d 321, 326 (Tex. Crim. App. 1994)(habitual drug abuse is evidence of future dangerousness).

[9] *See Jones v. State*, 119 S.W.3d 766, 781 (Tex. Crim. App. 2003)("even without the two extraneous murders, the evidence of a brutal murder, of multiple assaults, and of gang membership supports the jury's conclusion that appellant was a future danger").

[10] *Roberts v. State*, 220 S.W.3d 521, 526 (Tex. Crim. App. 2007).

[11] 530 U.S. 466 (2000).

[12] *Roberts*, 220 S.W.3d at 535.

[13] To facilitate the readability of this opinion, we will sometimes refer to these two types of

(continued...)

the relationship of such evidence to the special issues. Relying upon *Mosley v. State*[14] and *Ripkowski v. State*,[15] appellant complains in point of error one about the trial court's refusal to allow him to waive the mitigation special issue in order to avoid the introduction of this type of evidence.[16] In point of error two, appellant contends that this kind of victim-related evidence is inadmissible even with the mitigation issue.[17] In his third point of error, appellant complains that the trial court erred in denying his request for limiting instructions that would admonish the jury not to compare the worth of the victim to the worth of others and that would admonish the jury not to consider victim-related evidence in answering the future dangerousness issue.[18] Because the factual and legal issues

_____

(...continued)
evidence under the more general term "victim-related" evidence.

[14]  983 S.W.2d 249 (Tex. Crim. App. 1998).

[15]  61 S.W.3d 378 (Tex. Crim. App. 2001).

[16]  Appellant made this request before the punishment phase of trial began, and it was denied at that time.

[17]  Appellant raised this complaint in a written motion before trial, and he reurged the complaint before the State introduced its victim-related testimony during its punishment rebuttal case. The trial court denied relief on the complaint on both occasions.

[18]  Appellant did not ask for any limiting instructions at the time the victim-related evidence was admitted. During the jury charge conference appellant requested that the jury be instructed in the charge not to consider this type of evidence "in determining the answers to Special Issues No. 1 or 2." The trial judge denied this request. The following then occurred:

> [DEFENSE COUNSEL]: Thank you, Judge. We would submit it separately for "do not consider" for Issue 1, "do not consider" for Issue 2.
>      Second requested charge on victim impact: You have heard certain testimony regarding the character of the victim in this case and the effect of his death upon his survivors. You are instructed that you're not to use this evidence to compare the value of the life of the victim to that of other victims whose deaths might not result in as great a loss to their survivors or to the community.

> [TRIAL JUDGE]: Denied.

relating to these points of error are intertwined, we discuss them together.

### 1. *Principles of Statutory Construction*

Resolution of appellant's first three points of error depends in part upon statutory construction. When construing a statute, we give effect to the plain meaning of the text unless the text is ambiguous or the plain meaning would lead to absurd results that the Legislature could not possibly have intended.[19] When a court is called upon to deviate from a plain meaning analysis, it can examine, among other matters: the object sought to be attained; the circumstances under which the statute was enacted; the legislative history; common law or former statutory provisions, including laws on the same or similar subjects; and the consequences of a particular construction.[20] In conducting our inquiry, we keep in mind that we are not writing on a clean slate; we must take into account prior cases – namely *Mosley* and its progeny – in making our determination.[21]

### 2. *Mosley and Related the Legal Developments*

Before *Mosley*, our jurisprudence with respect to victim-related evidence had been "somewhat inconsistent and confusing,"[22] with two prior conflicting plurality opinions.[23] The *Mosley* decision specifically set out "to announce a consistent, if not always clear-cut rule to be

---

[19]  *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991).

[20]  *Ex parte Torres*, 943 S.W.2d 469, 473 (Tex. Crim. App. 1997); TEX. GOV'T. CODE, §311.023.

[21]  *See State v. Moore*, 225 S.W.3d 556, 566 (Tex. Crim. App. 2007); *Pettigrew v. State*, 48 S.W.3d 769, 771 (Tex. Crim. App. 2001); *Busby v. State*, 990 S.W.2d 263, 267 (Tex. Crim. App. 1999).

[22]  *Mosley*, 983 S.W.2d at 262; *see id.* at 261-62 (discussing prior cases).

[23]  *Id.*

followed in future cases."[24] The rule was that "[b]oth victim impact and victim character evidence are admissible, in the context of the mitigation special issue, to show the uniqueness of the victim, the harm caused by the defendant, and as rebuttal to the defendant's mitigating evidence."[25] We recognized that this rule of admissibility was subject to limitation under Rule 403 of the Texas Rules of Evidence[26] "when the evidence predominantly encourages comparisons based upon the greater and lesser worth or morality of the victim."[27] We explained that "[t]rial judges should exercise their sound discretion in permitting some evidence about the victim's character and the impact on others' lives while limiting the amount and scope of the testimony."[28] Considerations to be taken into account under Rule 403 included "the nature of the testimony, the relationship between the witnesses and the victim, the amount of testimony to be introduced . . . the availability of other testimony relating to victim impact and character" and the "mitigating evidence introduced by the defendant."[29]

We noted that our holding applied only to defendants who were "unaware, at the time of the crime, of the victims' character or of the impact that the victims' deaths will have on others."[30] When the evidence shows that the defendant was aware of those things at the time the crime was committed, then the victim-related evidence would "necessarily" be "relevant to his future

---

[24] *Id.* at 262.

[25] *Id.*

[26] Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

[27] *Mosley*, 983 S.W.2d at 262.

[28] *Id.*

[29] *Id.*

[30] *Id.* at 261 n.16.

dangerousness and moral culpability."[31] But when the defendant was not aware of those things, the victim-related evidence would be "patently irrelevant" to "a determination of future dangerousness" and would instead relate only to the mitigation special issue.[32] Finally, we said, where the victim-related evidence is relevant only to the mitigation special issue, the defendant could "waive reliance upon and submission of the mitigation issue, and if he does, victim impact and character evidence would be irrelevant and hence inadmissible."[33]

Subsequent cases have expounded upon *Mosley*'s pronouncements. We have upheld the introduction of photographic evidence designed to "humanize" the victim.[34] Based on *Mosley*'s recognition that aggravating circumstances are relevant to the jury's evaluation of the mitigation special issue, we have held that a defendant is not entitled to an instruction limiting the jury's consideration of extraneous offenses to the issue of future dangerousness.[35] Relying in a non-capital case on *Mosley*'s Rule 403 discussion, we found that a seventeen-minute video montage of the victim's life, set to music, was unfairly prejudicial and should not have been admitted in its entirety.[36] In cases in which the defendant knew his victim, we found, in accordance with the *dicta* in *Mosley*'s footnote 16, that the victim-related evidence in those cases was necessarily relevant to

---

[31] *Id.*

[32] *Id.* at 263.

[33] *Id.* at 264.

[34] *Solomon v. State*, 49 S.W.3d 356, 365-66 (Tex. Crim. App. 2001).

[35] *Jackson v. State*, 992 S.W.2d 469, 478 (Tex. Crim. App. 1999).

[36] *Salazar v. State*, 90 S.W.3d 330, 336-38 (Tex. Crim. App. 2002).

the defendants' future dangerousness and moral culpability.[37]

The only aspect of *Mosley* that has not yet been reaffirmed or adopted as a holding is the part of the discussion suggesting that a defendant can waive the mitigation special issue to avoid the introduction of victim-related evidence altogether. In *Tong v. State*, we recognized that part of the discussion as being *dicta* and declined to address the question because the defendant had not attempted to waive the mitigation issue and had thus forfeited error.[38] In *Ripkowski*, the defendant did request that he be permitted to waive the mitigation issue, and that request was granted.[39] In response to the claim that he should not have been permitted to effect such a waiver, we held that he was estopped from challenging the waiver by virtue of his own request.[40] Declining to address whether a defendant has a right to insist on such a waiver, we further explained that the question "would be ripe only in a case in which the trial court refused a requested waiver."[41] In a concurring opinion, Judge Cochran opined, in line with *Mosley*'s *dicta*, that the mitigation issue belongs to the defendant, and he should be allowed to exercise the "strategic decision" to forego it, if that is his desire.[42]

### 3. *Relationship between Victim-Related Evidence and the Special Issues*

Relying specifically upon the statutory language of the mitigation special issue, *Mosley*

---

[37] *Roberts*, 220 S.W.2d at 532; *Jackson v. State*, 33 S.W.3d 828, 830, 833-34 (Tex. Crim. App. 2000).

[38] 25 S.W.3d 707, 711 n.5 (Tex. Crim. App. 2000).

[39] 61 S.W.3d at 388.

[40] *Id.* at 388-90.

[41] *Id.* at 390 n.48.

[42] *Id.* at 395 (Cochran, J., concurring).

explained that "[v]ictim-related evidence is relevant to show that the mitigating circumstances are not 'sufficient' to warrant imposing a life sentence."[43]  This reading of the statute comports entirely with the United States Supreme Court's discussion in *Payne v. Tennessee*,[44] upon which *Mosley* also relied,[45] of the relationship between victim-related evidence and the mitigating aspects of punishment to be considered in a death penalty case.

In repudiating its prior decision in *Booth v. Maryland*,[46] the Supreme Court explained that *Booth* had "unfairly weighted the scales in a capital trial," imposing "virtually no limits" with respect to "the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances" while barring the State "from either offering a quick glimpse of the life which the defendant chose to extinguish [victim-character evidence] or demonstrating the loss to the victim's family and to society which has resulted from the defendant's homicide [victim-impact evidence]."[47] The Supreme Court decided that these types of prosecution evidence are "simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by the sentencing authorities."[48]  The Court further explained that such evidence of specific harm is allowed even though it may result in punishing differently defendants who possessed the same culpable mental state:

---

[43]  983 S.W.2d at 263 (quoting from the mitigation special issue found in Art. 37.071, §2(e)).

[44]  501 U.S. 808 (1991).

[45]  983 S.W.2d at 261.

[46]  482 U.S. 496 (1987).

[47]  *Payne*, 501 U.S. at 822 (citation and internal quotation marks omitted, bracketed material added).

[48]  *Id.* at 825.

Thus, two equally blameworthy criminal defendants may be guilty of different offenses solely because their acts cause differing amounts of harm. "If a bank robber aims his gun at a guard, pulls the trigger, and kills his target, he may be put to death. If the gun unexpectedly misfires, he may not. His moral guilt in both cases is identical, but his responsibility in the former is greater." The same is true with respect to two defendants, each of whom participates in a robbery, and each of whom acts with reckless disregard for human life; if the robbery in which the first defendant participated results in the death of a victim, he may be subjected to the death penalty, but if the robbery in which the second defendant participates does not result in the death of a victim, the death penalty may not be imposed.[49]

Most importantly for our purposes, the Supreme Court drew a specific link between victim-related evidence and a meaningful assessment of moral blameworthiness:

> We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. "The State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." By turning the victim into a "faceless stranger at the penalty phase of a capital trial," *Booth* deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.[50]

Further, the Supreme Court indicated that giving the defendant "the broadest latitude to introduce relevant mitigating evidence," as has been done under Supreme Court precedent, justly entails permitting the prosecutor to introduce "the human costs of the crime of which the defendant stands convicted."[51] "It is an affront to the civilized members of the human race to say that at sentencing in a capital case, a parade of witnesses may praise the background, character and good deeds of Defendant (as was done in this case), *without limitation as to relevancy*, but nothing may be said that

---

[49] *Id.* at 819.

[50] *Id.* at 825.

[51] *Id.* at 827.

bears upon the character of, or the harm imposed, upon the victims."[52]

The statutory mitigation special issue that was submitted in appellant's case conformed to the Supreme Court's requirement of according the defendant the "broadest latitude" to introduce mitigating evidence. It asked:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.[53]

Thus, the special issue placed virtually no limits on the types of mitigating evidence that might be introduced or the particular mitigating purpose for which the evidence might be considered. Under the logic of *Payne*, this all-encompassing mitigation issue included within its scope victim-impact and victim-character evidence because such evidence could be used to show that the mitigating circumstances relied upon by the defendant were not sufficient to justify a life sentence.

But the "future dangerousness" special issue is different. That special issue asks: "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."[54] The future dangerousness special issue is not all-encompassing; it narrows the jury's focus in a particular way. Not all evidence of mitigating value is relevant to that

---

[52] *Id.* at 826 (quoting *State v. Payne*, 791 S.W.2d 10, 19 (Tenn. 1990), with approval) (emphasis added).

[53] Art. 37.071, §2(e)(1)(1999). The current version of the mitigation special issue differs from the issue applicable in appellant's case in only one respect: the words "without parole" immediately follow "life imprisonment." *See* Art. 37.071, §2(e)(1).

[54] Art. 37.071, §2(b)(1). The current version of the special issue does not differ from the version applicable to appellant.

special issue.[55] Most evidence that the State or the defendant might wish to present as "aggravating" or "mitigating" can be given effect through the future dangerousness special issue[56] but only for the special issue's narrow purpose: showing whether or not the defendant constitutes a continuing threat to society. The future dangerousness issue does not present the State with a situation in which the defendant can present any and all types of mitigating evidence for any and all types of mitigating purposes. Just as some evidence of mitigating value may be irrelevant to the future dangerousness determination, some evidence of aggravating value may likewise be immaterial.

In practical effect, the future dangerousness special issue turns on the jury's assessment of what kind of person the defendant is: Is the defendant someone who is likely to commit criminal acts of violence in the future? When the defendant knows the victim, and thus (it may be inferred) he is aware of the victim's character or of the relationships the victim has with others, the victim's character and relationships necessarily become relevant to the future dangerousness determination because such evidence shows that the defendant is the kind of person who would kill someone of that character or with that particular network of relationships. And to the extent the defendant's knowledge of the victim's relationships give rise to the ability to reasonably foresee the harmful effects the victim's death would have on others, the jury can likewise consider that information with respect to the defendant's future dangerousness.

On the other hand, when the defendant is a stranger to the victim, and thus does not know

---

[55] *See Penry v. Lynaugh*, 492 U.S. 302 (1989).

[56] While the Supreme Court in *Jurek v. Texas*, 428 U.S. 262 (1976), was too optimistic in concluding that the future dangerousness issue swept *all* types of mitigating circumstances within its reach, *see id.* at 272-74, the Supreme Court's conclusion at least accurately reflected that the special issue's scope was indeed very broad with respect to the kinds of evidence that are relevant to its resolution.

the victim's character or relationships, evidence relating to those topics does not help the jury determine what kind of person the defendant is. To be sure, a defendant who kills a stranger could and should realize that the victim is a unique human being, with his or her own hopes and dreams, and the defendant could and should anticipate that other people may mourn the victim's passing. Those things are a matter of common knowledge, which a prosecutor could argue to the jury without the support of any evidence in the record.[57] But if, at the time the offense was committed, the defendant was ignorant of the specific facts regarding the victim's character or relationships, then those specific facts are not relevant to the future dangerousness determination.[58] That is the conclusion arrived at in *Mosley*, and we find it to be entirely correct. And it follows that, if the mitigation special issue were not a part of the case, victim-related evidence that is relevant only to the mitigation special issue would be inadmissible.

### 4. *Nature of the Mitigation Special Issue*

The question then becomes whether appellant had the right to remove the mitigation special issue from the case. Generally, a matter can be waived so long as it is not an "absolute requirement or prohibition," designed to be implemented regardless of the parties' wishes.[59] By statute, a defendant is permitted to "waive any rights secured him by law" except that a defendant may not

---

[57] *Martinez v. State*, 17 S.W.3d 677, 692 (Tex. Crim. App. 2000); *Nenno v. State*, 970 S.W.2d 549, 559 (Tex. Crim. App. 1998).

[58] Of course, even a stranger might have been aware at the time of the crime of some facts relating to the victim (e.g. a victim who is famous or one who is visibly pregnant), rendering evidence relevant to future dangerousness to the extent of the defendant's actual awareness.

[59] *Marin v. State*, 851 S.W.2d 275, 279 (Tex. Crim. App. 1993).

waive the right to a jury trial in a death penalty case.[60]

Because the present case involves the death penalty, we initially examine whether waiving submission of the mitigation special issue would be tantamount to waiving trial by jury. Obviously, a defendant who waives the mitigation special issue would have still received a jury trial on guilt and on the future dangerousness special issue, so *at most*, only a partial interference with the jury trial requirement would be accomplished.[61] But waiving or foregoing a jury trial classically involves shifting determination of the matter to the judge, not withdrawing the matter from consideration altogether. For example, in *United States v. Gaudin*, a defendant was deprived of his right to a jury trial by the prior federal practice of submitting the "materiality" element of a perjury offense to the judge rather than to the jury.[62] In Texas, even when a defendant's waiver of a jury trial is accompanied by a plea of guilty, the trial judge still retains the authority as the factfinder to find the defendant guilty of a lesser-included offense or even to render an acquittal.[63] In this case, appellant did not seek to have the judge decide the mitigation special issue, with the possibility of it being resolved in his favor; rather, appellant sought to waive a determination on that issue altogether.

In addition, no one would say that a defendant's choice to forego a defensive issue amounts

---

[60] Art. 1.14(a). *See also* Art. 1.13(b).

[61] *See Prystash v. State*, 3 S.W.3d 522, 532 (Tex. Crim. App. 1999)("It said that a waiver of trial by jury, which is forbidden in a capital case in which the State sought the death penalty, occurred when the verdict did not include a special issue which was required by the applicable statute. There are several fatal flaws in this reasoning. To begin with, if this were an improper waiver, the doctrine of invited error estops the appellant from complaining of it. Second, *it is untrue on its face*; *the case was tried to a jury.* The worst that can be said is that the jury returned a verdict which did not answer one issue.")(emphasis added).

[62] 515 U.S. 506 (1995).

[63] *Aldrich v. State*, 104 S.W.3d 890, 893 (Tex. Crim. App. 2003).

to a waiver of a jury trial. For example, suppose evidence in a capital murder prosecution raises the issue of self-defense, but the defendant and his counsel have decided that submission of self-defense would, on balance, be detrimental to the defendant's interests. No one would seriously argue that the statutory proscription against waiving a jury trial requires that a self-defense instruction be submitted against the defendant's wishes.[64] Of course, what remains to be determined is whether the mitigation special issue is a defensive issue or an element of the State's case. We turn next to that question.

Whether the mitigation special issue is an element of the prosecution's case or a defensive issue is critically important. A defendant cannot waive submission of an element of the prosecution's case to the finder of fact.[65] But submission of a defensive issue is a strategic decision to be made by the defendant and his attorney.[66] Not only is a defendant *permitted* to forego submission of a defensive issue, but he is also entitled to *insist* that a defensive issue not be submitted. If the mitigation special issue is properly characterized as a defensive issue, then it follows that the defendant would have the right to insist upon waiving its submission.

For several reasons, we hold that the mitigation special issue is a defensive issue. First, as

---

[64] *See Posey v. State*, 966 S.W.2d 57, 63 (Tex. Crim. App. 1998)(warning against legal requirements that would "impose on defendants unwanted defensive issues in the charge").

[65] *See Smith v. State*, 74 S.W.3d 868, 874 (Tex. Crim. App. 2002)(submission of "deliberateness" special issue cannot be waived). *See also Martin v. State*, 200 S.W.3d 635, 638-39 (Tex. Crim. App. 2006)(even if defendant stipulates to jurisdictional priors in a felony DWI prosecution, jury must be instructed on the elements). But a defendant may be estopped from challenging the failure to submit an element when he requested the lack of submission. *Smith*, 74 S.W.3d at 874; *Ripkowski*, 61 S.W.3d at 388-89; *Prystash v. State*, 3 S.W.3d 522, 531-32 (Tex. Crim. App. 1999).

[66] *Delgado v. State*, 235 S.W.3d 244, 249-50 (Tex. Crim. App. 2007); *Posey*, 966 S.W.2d at 63.

we observed in *Mosley*, the State has no burden of proof on the issue.[67]  We are aware of no other situation in which the State is exempted from the burden of proving an element of its own case, whether at guilt or at punishment.  Defensive issues are more varied: sometimes the burden is on the State and sometimes the burden is on the defendant.[68]  But a hallmark of a "States's issue" is the State's burden to prove the issue.

Second, the mitigating nature of the special issue suggests that it is a defensive issue.  Sometimes a mitigating factor can be found within the elements of an offense, as was the case with the old voluntary manslaughter statute,[69] or as an "exception" to the application of an offense.[70]  But the mitigation special issue for death penalty cases is neither embedded within elements the State must prove nor is it set up as an exception.  Instead, the mitigation special issue is framed as a stand-alone punishment mitigation issue, a characteristic it shares with a number of punishment mitigating factors that are clearly defensive issues, including temporary insanity caused by intoxication,[71] unsuccessful renunciation of an inchoate offense,[72] the current sudden passion issue in a murder case,[73] release in a safe place under both the older and newer versions of the aggravated kidnapping

---

[67]  983 S.W.2d at 264.  *See also Ex parte Staley*, 160 S.W.3d 56, 59 n.6 (Tex. Crim. App. 2005).

[68]  *Compare* TEX. PEN. CODE §§2.03 ("Defense"), 2.04 ("Affirmative Defense").

[69]  *See* TEX. PEN. CODE §19.04 (1992)("sudden passion").

[70]TEX. PEN. CODE §2.02.

[71]  *Id.*, §8.04(b), (c).

[72]  *Id.*, §15.04(d).

[73]  *Id.,* §19.02(d).

statute,[74] and mental retardation in a death penalty case.[75]

Third, the mitigation special issue is structured to make the defendant benefit from an affirmative answer.[76] Ordinarily, the party that benefits from a "yes" answer to an issue is the party to whom the issue belongs. When the question of guilt is submitted for a "yes" or "no" answer, a "yes" answer invariably signifies a vote of guilty. Likewise, an "affirmative finding" of a deadly weapon benefits the State.[77] And of course, the "future dangerousness" and "anti-parties" special issues are framed so that a "yes" answer supports a sentence of death, being sought by the State.[78] In contrast, the various codified defensive issues lend themselves to being submitted to elicit a "yes" answer to the defendant's benefit.[79]

Fourth, the defensive nature of the mitigation special issue is indicated by its placement in subsection (e) of the statute. The State's special issues have traditionally been found in subsection (b) of the capital sentencing statute, where one can currently locate the future dangerousness and anti-parties special issues. Had the Legislature intended the mitigation special issue to be another State's issue, it could have simply added it to subsection (b). But it did not, choosing instead to craft a separate subsection. At one point in time – indeed at the time of appellant's trial – subsection (e)

---

[74] *Id.*, §20.04(d); TEX. PEN. CODE §20.04(b)(1992); *See Williams v. State*, 851 S.W.2d 282, 285-86 (Tex. Crim. App. 1993)(construing "safe place" mitigating factor under the old law to be a defensive issue).

[75] *Hall v. State*, 160 S.W.3d 24, 38 (Tex. Crim. App. 2004).

[76] Art. 37.071, §2(e), (g).

[77] *See e.g.* Art.42.12, §3g(b).

[78] Art. 37.071, §2(b)(1) & (2), (g).

[79] *See e.g.* footnotes 71-74.

contained another provision that involved what was clearly a defensive matter: submission of a parole instruction.[80] The parole instruction was submitted only "on written request of the attorney representing the defendant."[81]

Finally, the mitigation special issue was a legislative response to the Supreme Court's decision in *Penry v. Lynaugh*. It was designed to fix a constitutional deficiency in the old Texas capital sentencing scheme, not to give the State an advantage it would not have had under that scheme. Allowing a defendant to "opt out" of the "*Penry*" portion of the scheme – falling back on what the Texas scheme would be like if *Penry* had not been decided – seems more in accordance with the legislative intent than saddling the defendant with an issue that is supposedly to his benefit but that he does not in fact want.

We see three points of distinction that could be made between the mitigation special issue and other issues that are traditionally characterized as defensive, but, for the reasons discussed below, those distinctions do not dissuade us from our conclusion that the mitigation special issue is in fact a defensive issue. First, one could point out that the mitigation special issue is designed to be applicable in every case. Typically, a defensive issue does not appear in every case but must be raised by the evidence. But there is at least one other example of a defensive matter that was designed to be applicable in every death penalty case: the parole instruction, which needed only a written defense request to warrant its inclusion in any death penalty case covered by the version of the statute that authorized the instruction. Given some of the unusual aspects of death penalty

---

[80] Art. 37.071, §2(e)(2)(1999).

[81] *Id.*

cases,[82] it is not unreasonable to think that the Legislature might craft a defensive issue that would appear in every case by default.

This leads to the second point, that, while the provision authorizing the parole instruction contained language giving the defendant the option to decide whether to submit the instruction, the subsection that authorizes the mitigation special issue contains no such language. But we should remember that, under *Almanza v. State*, jury charge error is never completely forfeited; the lack of a request or objection merely affects the harm analysis.[83] Under *Posey*, a party can forfeit the right to complain about the omission of a defensive issue because the defensive issue must be requested before the trial court has a duty to place it in the charge, and so no "error" occurs absent a request.[84]

But what happens when the Legislature enacts a defensive issue or instruction that will apply in every case of a certain type, regardless of the facts? If the Legislature simply designates that the instruction or issue be submitted, we would construe the failure to submit as error, regardless of who would benefit from the submission.[85] To allow the omission of a parole instruction to be completely

---

[82] *See*, for example, *Ring v. Arizona*, 536 U.S. 584, 597-609 (2002) (viewing death penalty sentencing procedure in which at least one aggravating circumstance must be found to justify the death penalty [as is constitutionally required] as increasing punishment beyond the statutory maximum based upon a finding of fact, thus requiring a jury determination under *Apprendi v. New Jersey*, 530 U.S. 466 (2000)).

[83] 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)(construing Art. 36.19).

[84] 966 S.W.2d at 63.

[85] *Delgado*, 235 S.W.3d at 252 n.34 (In *Huizar*, this Court distinguished *Posey* and explained the difference between instructing the jury on "defensive" issues and instructing them on the law that is applicable to all cases)(quoting *Huizar v. State*, 12 S.W.3d 479, 484 n.7 (Tex. Crim. App. 2000)("In contrast to a 'defense' which depends on the defendant's theory of the case and the evidence presented, applicability of article 37.07 § 3(a) is not contingent on either party's theory of the case. Rather, article 37.07 § 3(a) is a legislatively prescribed burden of proof applicable to

(continued...)

forfeitable, then, the Legislature had to include a provision requiring a defense request. Likewise, the absence of a "request" provision for the mitigation special issue means that the mitigation special issue cannot be forfeited by inaction. But *Almanza* does not prevent a defendant from *waiving* an issue,[86] and at any rate, a provision permitting waiver can already be found in Article 1.14. So, the Legislature would not have to attach a specific waiver provision to the mitigation special issue for it to be waivable.

Finally, one could argue that the broad scope of the mitigation special issue makes it similar to the noncapital sentencing determination, which is not an issue that belongs to either party. There is no burden of proof on either party with respect to the number of years that might be assessed in a noncapital case,[87] virtually any mitigating evidence can be considered in that determination, the determination is normative as it is with respect to the mitigation special issue,[88] and victim impact and character evidence is admissible under the same basic guidelines.[89] By analogy, one might attempt to characterize the mitigation special issue as "neutral," belonging to neither party. But unlike the noncapital sentencing determination, the mitigation special issue is a *special issue*, and thus, it is also a discrete issue, unlike the general assessment of punishment in noncapital cases.

---

[85](...continued)
extraneous offense and bad act evidence admitted at punishment *in all non-capital cases*.")) (emphasis in original).

[86] However, a general statement by defense counsel that he has no objection to the jury charge is not sufficient to effect such a waiver. *Bluitt v. State*, 137 S.W.3d 51, 53 (Tex. Crim. App. 2004).

[87] *See Miller-El v. State*, 782 S.W.2d 892, 896 n.1 (Tex. Crim. App. 1990).

[88] *McFarland v. State*, 928 S.W.2d 482, 499 (Tex. Crim. App. 1996).

[89] *See Salazar,* 90 S.W.3d at 336-38.

Every other discrete issue that could be considered by a jury belongs to either the State or the defendant. Moreover, we think discrete issues, by their nature, must belong to one of the parties. Either the issue is a part of the State's case or it is a defensive issue. The general assessment of punishment in a noncapital case is "neutral" only in the sense that it is not a discrete issue at all. Had the Legislature intended to enact a neutral, non-waivable mechanism for considering mitigating evidence, it could have simply chosen to confer upon the jury the authority to decide (after finding the defendant guilty and answering the future dangerousness issue) whether to impose a punishment of "life" or "death." But that is not what the Legislature did.

We conclude that the mitigation special issue is a defensive issue that cannot be forfeited by inaction but can be waived, and because it is a defensive issue, the defendant has a right to insist upon its waiver. The trial judge in this case erred in refusing to allow appellant to waive submission of the issue to the jury, and as a result, erred in admitting victim-impact and victim-character evidence that would have otherwise been excluded.

## 5. *Harm*

Appellant argues that the error in this case should not be held harmless, contending that he had a "strong defense to the continuing threat issue" and that there is "no assurance that [the jurors] would have reached the same answer" to that issue "if they had not heard the victim impact/character testimony." It is not entirely clear from his argument whether he thinks the error is immune from a harmless error analysis or whether he merely thinks the error was not harmless in his case. Nor does appellant attempt to explain whether the error at issue is constitutional or non-constitutional in nature, or whether we should apply harm standards for jury charge error or for error in improperly admitting evidence.

In *Cain v. State*, we said, "Except for certain federal constitutional errors labeled by the United States Supreme Court as 'structural,' no error, whether it relates to jurisdiction, voluntariness of a plea, or any other mandatory requirement, is categorically immune to a harmless error analysis."[90] The erroneous submission of an unwanted defensive issue has not been labeled by the United States Supreme Court as structural.[91] We therefore conclude that the error in this case is not "structural," and thus is subject to some sort of harm analysis.

Preserved jury charge error is evaluated under *Almanza*'s "some harm" standard unless we determine that the error is constitutional in nature, in which case the "beyond a reasonable doubt harmless" standard would apply.[92] Evidentiary error is evaluated under the Texas Rule of Appellate Procedure 44.2, with constitutional error evaluated under the "beyond a reasonable doubt standard" of Rule 44.2(a) and nonconstitutional error evaluated under the "substantial rights" standard of Rule 44.2(b).

In erroneously submitting the mitigation special issue, the trial court essentially interpreted the issue as an element of the State's case rather than a defensive matter that could be waived. That error is simply a misconstruction of the statute. Likewise, the erroneous admission of evidence constituted a mere statutory violation because, without the mitigation special issue, the victim-related evidence was not relevant under the statutory scheme. As *Payne* makes abundantly clear, there is no constitutional impediment to the consideration of victim-related evidence. The trial court's errors

---

[90] 947 S.W.2d 262, 264 (Tex. Crim. App. 1997).

[91] *See Johnson v. State*, 169 S.W.3d 223, 235-36 (Tex. Crim. App. 2005)(discussing Supreme Court cases, including *Johnson v. United States*, 520 U.S. 461, 468-69 (1997), containing the Supreme Court's "most recent list of structural errors").

[92] *See Jimenez v. State*, 32 S.W.3d 233, 236-37 (Tex. Crim. App. 2000).

in this case were statutory rather than constitutional in nature, and thus, we apply the harm standards for nonconstitutional errors.

In conducting our harm analysis, we find a number of factors that are relevant to determining harm for the type of error before us.[93] First, we must assess the prejudicial effect of the anti-mitigating evidence that was admitted but that would have been excluded had the mitigation issue not been given. Victim-related evidence can range from the very mild[94] to that which is especially strong.[95] As we discussed above, the prosecutor may argue, with respect to the issue of future dangerousness, the general inference that a person who kills a stranger knows or should know that the victim is a unique human being, with his or her own hopes and dreams, and that other people may mourn the victim's passing. In assessing harm, we consider, among other things, the extent to which the prejudice arising from this general inference is exceeded by the prejudice generated by the specific victim-related evidence.[96]

Second, we must determine whether appellant had any mitigating evidence that had significant impact under the mitigation special issue apart from its impact under the other special

---

[93] Although these are the main factors to be assessed in a harm analysis for the type of error before us, we do not preclude the possibility of other relevant factors in a particular case. Also, the discussion below assumes that the death penalty was assessed. A trial court's failure to allow a defendant to waive the mitigation special issue would obviously be harmless if a life sentence were imposed.

[94] *See Solomon*, 49 S.W.3d at 366 (a few photographs of the victim and his family).

[95] *See Griffith v. State*, 983 S.W.2d 282, 289 (Tex. Crim. App. 1998)(victim planned all family holiday celebrations, cared for cancer-ridden father, and father quit fighting the disease after the victim died).

[96] *See Schutz v. State*, 63 S.W.3d 442, 445-46 (Tex. Crim. App. 2001)(Where the jury can legitimately infer from admissible evidence a conclusion that the expert witness was not allowed to testify to, error in permitting the expert to testify to that conclusion is more likely to be harmless).

issues, and we must assess the relative strength of such evidence and of the special mitigating inference produced by this evidence.

Third, we must assess the relative strength of the parties' positions on the other special issues, particularly the issue of future dangerousness. The future dangerousness determination is the one most susceptible to being influenced by inadmissible victim-related evidence because the future dangerousness special issue is the only issue (other than the mitigation special issue) that focuses more generally on what kind of person the defendant is rather than exclusively on what he did during the incident from which the prosecution arose.[97] This more general focus on what kind of person the defendant is means that the jury is called upon to make determinations that are to some degree subjective, as opposed to resolving matters of historical fact.[98] If the State's evidence on future dangerousness is overwhelming, then error in refusing to permit a waiver of the mitigation special issue is more likely to be harmless because the appellate court may conclude that the defendant would have lost on the future dangerousness issue in any event.[99]

Fourth, we should look to the parties' arguments to determine whether the error has been

---

[97] *Compare* Art. 37.071, §2(b)(1)(future dangerousness) & (e)(mitigation) *with* Art. 37.071, §2(b)(2)(anti-parties) and Art. 37.0711, §3(b)(1)(deliberateness) & (3)(provocation).

[98] *Compare McGinn v. State*, 961 S.W.2d 161, 169 (Tex. Crim. App. 1998)(no factual sufficiency review due to the highly subjective nature of the future dangerousness special issue) *with Wardrip v. State*, 56 S.W.3d 588, 590-91 (Tex. Crim. App. 2001)(holding that a factual sufficiency review of the deliberateness special issue could be conducted because that issue, "unlike future dangerousness, requires a finding of historical fact").

[99] *See Neder v. United States*, 527 U.S. 1, 17-18 (1999)(omission of "materiality" element of offense harmless because jury verdict would have been the same).

emphasized or ameliorated.[100]  And finally, we should examine any instructions given by the trial court that might tend to cure or ameliorate the effect of any anti-mitigating evidence that was improperly before the jury.[101]

We turn to the first factor: the prejudicial effect of the anti-mitigating evidence that would not have otherwise been admitted.  If appellant had not attempted to waive the mitigation special issue, the State's evidence would not have exceeded what was permissible under Rule 403 (under the guidelines articulated in *Mosley*), but we recognize that some of this evidence was moderately strong.  Carter was an excellent individual, whose parents were deservedly proud of him, and a good student with a promising medical career ahead of him.  He had a serious relationship heading toward marriage that was shattered by appellant's actions.  The evidence suggested that Carter's mother suffered more than just the foreseeable grief associated with the death of a loved one: she suffered a disabling depression, which was later accompanied by multiple sclerosis.

But much of this testimony was heard at the guilt phase of trial, where it came in either without objection or without a request for an instruction to disregard.  Regardless of the trial court's ruling on appellant's request to waive the mitigation special issue, the jury would have known that

---

[100] *Haley v. State*, 173 S.W.3d 510, 519 (Tex. Crim. App. 2005)(appropriate to consider whether State emphasized the error in admitting extraneous offense victim-impact evidence); *LaPoint v. State*, 750 S.W.2d 180, 192 (Tex. Crim. App. 1988)(appropriate to consider whether prosecutor exploited erroneous instruction in closing argument); *Hawkins v. State*, 135 S.W.3d 72, 84 (Tex. Crim. App. 2004)(prosecutor's corrective action can be considered in determining harm).

[101] *Ovalle v. State*, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000)(other portions of the jury charge relevant to harm analysis of a jury charge error); *Waldo v. State*, 746 S.W.2d 750, 752-57 (Tex. Crim. App. 1988)(curative instruction can eliminate harm flowing from improper admission of evidence); *Phillips v. State*, 193 S.W.3d 904, 911 n.40 (Tex. Crim. App. 2006)(limiting instruction can sometimes render an error harmless) .

Carter was one of the top students at Baylor Medical School. The jury would also have known that Carter and Saifi were in a serious dating relationship that was likely headed for marriage. And the evidence of grief suffered by the victim's father, brother, and bride-to-be, and even to some degree by his mother, was consistent with the reasonably foreseeable general inference that a murdered victim would leave grieving relatives behind.

We also point out that the victim-related evidence of which appellant complains spans only ten pages of nearly 400 pages of punishment phase testimony. And much of the victim-related testimony was general. For example, although Dr. Carter did characterize his son as a "shining example," he did not describe the victim's good qualities in any detail.

Next, we address whether appellant presented any evidence that had mitigating impact peculiar to the mitigation special issue. The prosecutor suggested that there was no evidence favorable to appellant under the mitigation special issue, except possibly youth, which he argued was not mitigating:

> [Special issue two encompasses any] evidence you find that mitigates, that reduces his moral blameworthiness, and I suggest to you there is not any. The only thing really they can argue is age.

> * * *

> And age, I suggest to you is not a mitigating factor, but that is for you to decide.

> He is from a, well, good family. There has been, you know, so many people that have been here for him all his life. Mother and father, all the aunts and uncles, all kinds of people. People always willing to help. He's not from a subject of sexual, physical, or any type of emotional abuse, but from a loving family, but he does not have a conscience and you can't give him one, but I ask you to answer these questions based upon the law and evidence and nothing else and we will abide your verdict.

Appellant could not point to low intelligence, an abusive family, or some other bad circumstance in

his life that was beyond his control in order to explain why he was the kind of person capable of committing heinous crimes. He could point to his youth, and "as any parent knows . . . '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.'"[102] But these known aspects of youth are precisely what would permit a jury to give mitigating effect to youth within the context of the future dangerousness special issue.[103] So there was no evidence in the record with mitigating impact peculiar to the mitigation special issue – a point the prosecutor made in his argument.

We next turn to the relative strength of the parties' positions on the other special issues, particularly future dangerousness. In this case, future dangerousness was the only other special issue submitted. We recognize that the State's evidence was substantial. Among other things, the State submitted evidence of multiple shootings and robberies, violent behavior in jail, gang membership, and evidence that the jury could construe as indicating a lack of true remorse and a failure on appellant's part to truly accept responsibility for his actions.

On just about every issue, appellant had an answer, but the answers were not particularly credible. Appellant wished the jury to believe that he was a mere follower, that he was dominated

---

[102] *Roper v. Simmons*, 543 U.S. 551 (2005)(quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)).

[103] *Johnson*, 509 U.S. at 370 ("If any jurors believed that the transient qualities of petitioner's youth made him less culpable for the murder, there is no reasonable likelihood that those jurors would have deemed themselves foreclosed from considering that in evaluating petitioner's future dangerousness. . . .Although Texas might have provided other vehicles for consideration of petitioner's youth, no additional instruction beyond that given as to future dangerousness was required in order for the jury to be able to consider the mitigating qualities of youth presented to it.").

by three different people at three different times: by Butler in the Cherry robbery, by Phillips for various crimes occurring on the night Carter was killed, and by Dunn at the time appellant tried to withdraw money from an ATM machine. But it was appellant who shot two people, appellant who was alone in the car with two different victims, and appellant who took over after Dunn froze up.

Moreover, while appellant produced the testimony of a chaplain to say he had "changed," more concrete evidence, in the form of prison disciplinary reports, showed that appellant was involved in numerous fights while incarcerated – at least one of which was without any provocation. Appellant's letters to Butler indicated that he was still a member of a gang and had not in fact reformed his behavior. And even defense counsel expressed dissatisfaction with appellant's testimony at trial.

With regard to argument, it could be said that the prosecutor "exploited" the improper submission of the mitigation special issue by pointing to the absence of evidence that could be given significant mitigating impact under that issue, but it is difficult to see how that type of "exploitation" could have any spillover effect on the jury's determination of future dangerousness. More importantly, the prosecutor did not exploit the introduction of the victim impact and character evidence but joined defense counsel's efforts to minimize any prejudicial effect flowing from that evidence. Defense counsel emphasized that the jury should not punish appellant more severely simply because his victim was a valuable member of society:

> Uhm, nothing that I said I hope during the trial, certainly now, should be taken as any sign of disrespect for Mr. Carter's family. Uhm, it's hard to put yourself in their position. It's hard to know how you would deal with such a thing but you as a jury are expressing all of our feelings as a society when you make a judgment in a case like this. And, again, with no disrespect to the Carters, think about if we value that person's life, Matthew Carter, think about if we value that person's life, Matthew Carter, and say because he was a fine person we're going to increase the punishment

of Perry Williams. Inevitably what that causes, imagine a person at the Blockbuster was a drug dealer. That he just come from a club selling cocaine. That he was in Matthew Carter's place. Would that be something that we as defense lawyers would argue to you as a jury? This guy was no good. It didn't matter, he was a drug dealer. So what? We'd never argue that because every life has value because it's a life, not because of who you are.

At least to some degree, the prosecutor expressed agreement with defense counsel's argument:

I agree, not one of these questions says do you feel sorry for doctor and Mrs. Carter. Not one of these questions says do you feel sorry for Justin and Maryam, and their in-laws and Mrs. Carter's brother and his roommate and his friends. I mean, you know, it does not say do you feel sorry for them. Okay. I am not asking you to consider that. Does not say do you feel sorry for the defendant's family. It's not in there.

That passage was in fact the only part of the prosecutor's argument that made any reference to the victim-related evidence.

Indeed, the entire prosecutorial argument focused on appellant's role in the offense and other evidence relating to his future dangerousness. The State characterized appellant as playing a dominant role in Carter's murder and two of the other robberies. Appellant was depicted as not having a conscience and not accepting responsibility. One of the prosecutors described appellant variously as "unpredictable," "cold-blooded," and "trigger-thirsty." The prosecutor also characterized Carter's murder as "an attempt to eliminate witnesses." The whole thrust of the State's argument was on the future dangerousness special issue, with only a brief comment on the mitigation issue, and with no attempt to use the victim impact and character evidence.

Finally, we observe that the trial judge gave no limiting instruction or any other type of remedial instruction that might have lessened any prejudice flowing from the victim-related evidence. We point out that appellant did not request a limiting instruction at the time the evidence was presented. A failure to request a limiting instruction at the time evidence is presented renders

the evidence admissible for all purposes and relieves the trial judge of any obligation to include a limiting instruction in the jury charge.[104] It is also true that appellant failed to obtain a ruling on his request to instruct the jury to not consider victim-related evidence under the future dangerousness issue. With respect to his third point of error – the failure of the trial court to give a limiting instruction – these failures on appellant's part are fatal to his claim. But the first point of error deals with an issue logically prior to the question of whether a limiting instruction should be given – whether the victim-related evidence should have been admitted at all. Although a party has a duty to attempt to prevent the trial judge from falling into error, once that duty has been fulfilled and the trial judge nevertheless commits an error, the onus is really on the trial judge to take remedial measures that may mitigate the harmfulness of the error.[105]

Although appellant did not have evidence other than youth that could have been used in his favor under the mitigation special issue and the trial court took no remedial action to limit the effect of the victim-related evidence, the other factors weigh strongly in favor of finding the error harmless. The victim-related evidence took up only a brief part of the record. Most of the evidence elicited was of the type that could be reasonably foreseen as arising from a murder. Much of the evidence was elicited at the guilt phase without objection or where no instruction to disregard was given (and none was requested). The State's future dangerousness evidence was strong, including multiple robberies, multiple shootings, violent incidents in jail while the capital murder prosecution was

---

[104] *Hammock v. State*, 46 S.W.3d 889, 892-95 (Tex. Crim. App. 2001).

[105] *Cf. Hawkins,* 135 S.W.3d at 76 (explaining that the failure to grant a mistrial after an objection has been sustained and a curative instruction given is a question of error not of harm because "[t]he only adverse ruling - and thus the only occasion for making a mistake - was the trial court's denial of the motion for mistrial.").

pending, appellant's own writings indicating his continued gang membership, and appellant's disastrous performance during cross-examination that conveyed to the jury that he was not in fact accepting responsibility for his criminal conduct. And finally, the prosecutor did not use the victim impact and character evidence in his closing argument but joined defense counsel in minimizing its relevance in front of the jury. Considering everything we have discussed, we conclude that appellant was not harmed by the trial court's erroneous submission of the mitigation special issue and the resulting admission of victim impact and character evidence.

In summary, with respect to point of error one – waiver of the mitigation special issue and the resulting admission of victim-related evidence – we conclude that the trial court erred but that the error was harmless. With respect to point of error two, the admission of victim-related evidence irrespective of the waiver question, we find that the trial court did not err. With respect to point of error three, the submission of a limiting instruction, we find that the trial court did not err in failing to submit a limiting instruction in the jury charge because appellant failed to request one at the time the evidence was admitted. Points of error one through three are overruled.

### D. Execution Impact Testimony

In point of error four, appellant claims that the trial court erred in refusing to allow him to present testimony from his mother about the impact his execution would have on his family. He asserts that this violated his Eighth Amendment and Due Process rights. We have previously decided that "a trial court does not abuse its discretion in excluding 'execution-impact' testimony."[106] Point of error four is overruled.

### E. "Residual Doubt" Instruction

---

[106] *Roberts*, 220 S.W.3d at 532.

In point of error six, appellant contends the trial court erred in refusing his request that a residual doubt instruction be included in the punishment jury charge. We have decided this issue adversely to appellant's position.[107] Point of error six is overruled.

### F. Hearsay Statement / Right to Present a Defense

In point of error five, appellant complains that the trial court denied him his Sixth Amendment right to present a defense and his Eighth Amendment right "to obtain the jury's effective consideration of his defensive mitigation evidence on punishment" when it excluded the hearsay statement of one of his accomplices which purportedly supported his "factual and state-of-mind defense."

Appellant expressed his intention to testify at the punishment stage of trial that he had not intended to kill Carter. Appellant maintained that he had been holding the gun to Carter's head when Carter pushed him and caused appellant to 'tens[e] up' and pull the gun's trigger. In an effort to corroborate his version of the events, appellant attempted to introduce a portion of co-defendant Dunn's audiotaped statement to the police. He did not attempt to call Dunn himself because Dunn's attorney informed the parties that Dunn would invoke his Fifth Amendment right not to incriminate himself if the defense called him as a witness at trial. According to a transcription of the audiotaped statement, Dunn saw Carter "pushing [appellant] away or whatever" and then heard appellant's gun discharge. Dunn did not actually see appellant shoot Carter.

Appellant argued at trial that this corroborating evidence was relevant to the mitigation question because it constituted "a circumstance of the offense" that mitigated his culpability for the crime. Appellant further claimed that this evidence was vital to his case and its exclusion would

---

[107] *Gallo v. State*, 239 S.W.3d 757, 779 (Tex. Crim. App. 2007).

preclude him from presenting his defense. The State argued that the evidence was not relevant to any of the special issues and was merely appellant's attempt to relitigate the issue of guilt or innocence. After noting several United States Supreme Court cases, the trial judge found that the statement was "arguably inherent[ly] trustworth[y.]" The judge then confirmed that appellant intended to testify to substantially the same facts stated in the complained-of evidence. The judge concluded that the evidence should be excluded because a statement that merely corroborated appellant's testimony was "not crucially important to the determination of any of the issues at the punishment phase of trial." Appellant reurges his complaints on appeal.

To the extent appellant sought to use Dunn's testimony to support the proposition that he did not intend to kill Carter, he sought to relitigate the issue of guilt, and he was not entitled to do so.[108] Assuming, however, that the evidence could also support the proposition that appellant's decision to shoot was impulsive rather than premeditated, we further address appellant's claim.

In some instances, the exclusion of a defendant's evidence can amount to a violation of the right to compel the attendance of witnesses in the defendant's favor.[109] The Sixth Amendment, made applicable to the states through the Fourteenth Amendment, is a firm guarantor of the constitutional assurance of compulsory process to obtain favorable witnesses.[110] When an application of the local rules would be "fundamentally unfair" or constitutional rights directly affecting the ascertainment

---

[108] *Id.*

[109] *Potier v. State*, 68 S.W.3d 657, 659 (Tex. Crim. App. 2002).

[110] *Washington v. Texas*, 388 U.S. 14 (1967).

of guilt are implicated, the rules "may not be applied mechanistically to defeat the ends of justice."[111] In other words, in an appropriate case, local rules, like those prohibiting hearsay, should yield to constitutional protections. But this does not mean that every erroneous exclusion of a defendant's evidence amounts to a constitutional violation.[112]

In *Potier*, this Court noted that "evidentiary rulings rarely rise to the level of denying the fundamental constitutional rights to present a meaningful defense."[113] The Court explained that there are two distinct scenarios in which rulings excluding evidence might rise to the level of a constitutional violation: 1) when a state evidentiary rule categorically and arbitrarily prohibits the defendant from offering otherwise relevant, reliable evidence which is vital to his defense; and 2) when a trial court's clearly erroneous ruling excluding otherwise relevant, reliable evidence which forms such a vital portion of the case effectively precludes the defendant from presenting a defense.[114] In the first scenario, "the constitutional infirmity is in the arbitrary rule of evidence itself."[115] In the second scenario, "the rule itself is appropriate, but the trial court erroneously applies the rule to exclude admissible evidence to such an extent that it effectively prevents the defendant from presenting his defensive theory."[116]

Even if the constitutional principles set out above apply to the punishment phase of a capital

---

[111] *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Fuller v. State*, 829 S.W.2d 191, 207 (Tex. Crim. App. 1992).

[112] *Potier*, 68 S.W.3d at 659.

[113] *Id.* at 663.

[114] *Id*. at 659-62; *Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002).

[115] *Wiley*, 74 S.W.3d at 405.

[116] *Id.*

case – an issue we do not decide – the trial court did not err in excluding the evidence. In this case, the trial judge had the discretion to exclude Dunn's out-of-court statement to the police because it was hearsay and because it did not qualify as an exception to the general prohibition against hearsay.[117] Although some discussion was had that the statement might qualify as a statement against interest, the portion of the statement that appellant offered into evidence contained no self-inculpatory assertions.[118] Rather, this portion of the statement related what Dunn saw happen between appellant and the victim before he heard the gun discharge.

And constitutional considerations do not require that the rule against hearsay be overriden in this case. The trial judge's comment that Dunn's statement was "arguably inherent[ly] trustworth[y]" is not a holding that the statement was in fact reliable. We have found no facts in the record and appellant has directed us to none regarding the circumstances surrounding the taking of the statement. Furthermore, the judge provided no basis for the "trustworthiness" designation except to note that the statement was elicited by a police officer during an interrogation. This is not sufficient to show that the statement was in fact reliable.[119]

Appellant has also failed to show that the evidence was vital to his defense. The trial judge clarified that appellant would testify to his version of the events and that the portion of Dunn's

---

[117] TEX. R. EVID. 802-04.

[118] *See* TEX. R. EVID. 803(24); *Woods v. State*, 152 S.W.3d 105, 112 (Tex. Crim. App. 2004)(statement must be self-inculpatory to be admissible under the statement against interest exception).

[119] See *Chambers*, 410 U.S. at 300 (holding that the Due Process Clause affords criminal defendants the right to introduce into evidence third parties' declarations against penal interest . . . when the circumstances surrounding the statements "provid[e] considerable assurance of their reliability").

statement that he wanted to introduce would merely corroborate that testimony. Thus, appellant was able to present his version of the events to the jury albeit not to the extent and in the form he desired. Appellant has failed to show that the trial judge's ruling was erroneous. Point of error five is overruled.

## G. Request to Argue Last on Mitigation

In point of error seven, appellant asserts the trial court erred by refusing to allow him to argue last with regard to the mitigation issue. We have decided this issue adversely to appellant's position.[120] Point of error seven is overruled.

## H. Parole Instruction Argument

In point of error ten, appellant contends that the trial judge erred in overruling his objections to the prosecutor's punishment phase argument regarding parole eligibility and the future dangerousness special issue. Appellant claims that the prosecutor misstated the law by inviting the jurors to disregard the 40-year parole ineligibility instruction in answering the future dangerousness question. He claims that this improperly prevented the jury from effectively considering his "crucial mitigating evidence" of remorse, good jail behavior, prison classification and control of violence, and the "aging-out phenomenon." Specifically, appellant complains about the following argument and the objections made thereto:

> [PROSECUTOR]: As the defendant sits in the courtroom this day you're asked to answer this question. Do you find from the evidence beyond a reasonable doubt there's a probability that the defendant would commit criminal acts of violence –
>
> [DEFENSE COUNSEL]: Excuse me, Mr. [prosecutor]. I object. He asks the jury to read the charge and isolate it and ignore the parole provisions.

---

[120] *Masterson v. State*, 155 S.W.3d 167, 174-75 (Tex. Crim. App. 2005).

THE COURT:  Denied.

[PROSECUTOR]:  The parole provision, because you're not supposed to consider parole in reaching your decision, you're asked to answer this question today.  Now what I suggest [defense counsel] is saying is he wants you to put into this question that he is going to serve 40 years day-for-day.

[DEFENSE COUNSEL]:  Judge, that's the law.  I object to him striking the defendant over counsel's shoulder.

THE COURT:  Overruled.

[PROSECUTOR]:  And I ask don't rewrite this question.  Don't let him rewrite the question.  As the defendant sits in this courtroom this day, that's where we are.  This question is before you.  Today is the day that you have to answer it, and you have to answer it today, this question.

[DEFENSE COUNSEL]:  Judge, may I have a running objection to the misrepresentation of the law that counsel is telling the jury?

THE COURT:  Yes, sir.

[DEFENSE COUNSEL]:  Thank you.

[PROSECUTOR]:  Will that running objection be overruled?

THE COURT:  Yes.

[PROSECUTOR]:  You're to decide is the defendant – is there a probability that the defendant beyond a reasonable doubt would be a continuing threat to commit criminal acts of violence, a continuing threat to society, and that's the question.  Not put into it after he gets out after 40 years, if he gets out after 40 years.  You cannot put in he got a life sentence into the question, because in the charge it says, the very first part, it says the mandatory punishment for the offense of capital murder of which you have found the defendant guilty is death or confinement in the Texas Department of Corrections for life.

In the interest of completeness, we point out that defense counsel responded in his own closing argument to the prosecutor's comments:

On page 4, the Judge tells you about parole law.  This is the argument we have and we'll continue to have, I imagine, as long as we're both doing this.  Let me tell you

why I think what I'm saying is something that you can rely on.  On page 4 the Judge tells you that if you sentence someone or to get a life sentence in a capital murder case they're going to serve 40 calendar years without consideration of any good time. That means day-for-day.  Now, reality tells us that if Mr. Williams leaves here, goes to a prison unit in the Texas Department of Corrections with a capital murder life sentence that's where he is going to be for the next 40 years.  That's a fact.  Now they, [the prosecutor], does not want that to be a fact.  He wants to argue I'm grafting something on the statute that is not there, but you see it.  It's the Judge's words what the law is.  So when you're looking at Special Issue No. 1 you got to consider the society in which Perry Williams is going to be for the next 40 years.[121]

Before the Legislature provided for a jury instruction on parole eligibility in capital cases, a plurality of this Court in *Smith v. State* rejected the claim that such an instruction was constitutionally required.[122]  The holding and reasoning of that opinion was later adopted as binding precedent[123] and has been followed in numerous later decisions that we need not cite here.  In *Smith*, we expressly rejected the notion that parole eligibility was relevant to a jury's determination of future dangerousness:

> The subject is not proper even in the context of the second special issue because when a jury is considering whether a defendant represents a continuing threat to society, the term 'society' includes both the prison and non-prison populations.[124]

We have echoed this reasoning in subsequent cases.[125]

When the Legislature inserted the parole eligibility instruction requirement in the statute, it did not specify whether that instruction should have any effect on the jury's deliberation on the

---

[121]  No objection was made by the prosecution to this argument.

[122]  898 S.W.2d 838 (Tex. Crim. App. 1995)(plurality op.).

[123]  *Broxton v. State*, 909 S.W.2d 912, 919 (Tex. Crim. App. 1995).

[124]  898 S.W.2d at 846.

[125]  *Morris v. State*, 940 S.W.2d 610, 613 (Tex. Crim. App. 1997); *Collier v. State,* 959 S.W.2d 621, 623 (Tex. Crim. App. 1997).

special issues.[126] Under those circumstances, we cannot find fault with a prosecutor arguing as an advocate to the jury that the jury should not consider a defendant's minimum parole eligibility in determining whether he constitutes a future danger to society. The jury had the information about appellant's minimum parole eligibility, and they also heard defense counsel's argument on why it should be considered. The trial judge exhibited no partiality to either party's interpretation of the role played by the parole law instruction. The jury was thus in a position to give effect to the parole law instruction to the extent it was deemed appropriate. Point of error ten is overruled.

The judgment of the trial court is affirmed.

Delivered: June 11, 2008
Publish

---

[126] *See* Art. 37.071, §2(e)(2)(1999).