Opinion issued March 1, 2012



In The

Court of
Appeals

For The

First District
of Texas

————————————

NOS.
01-10-00793-CR, 01-10-00794-CR, 01-10-00795-CR, 01-10-00796-CR

———————————

James Larue Harralson, Appellant

V.

The State of
Texas, Appellee



 



 

On Appeal from the 10th District Court

Galveston County, Texas



Trial Court Case Nos. 09CR3854, 09CR3855, 09CR3856, 10CR0382

 



 

MEMORANDUM OPINION

          A
jury convicted appellant James LaRue Harralson in three cases of burglary of a habitation and in
one case of felony theft.  See Tex.
Penal Code Ann.
§§ 30.02, 31.03 (West 2003 & Supp. 2009).  After Harralson pleaded true to one
enhancement, which alleged that he was previously convicted of the felony
offense of aggravated robbery, the court assessed his punishment at 17 years in
prison on each burglary count and two years in prison for felony theft, with
all periods of confinement to run concurrently. 
In his first three issues on appeal, Harralson contends that the
evidence is legally insufficient to sustain his three convictions for burglary
of a habitation because there was no evidence that he entered the three
complainants’ trailers and because he was not responsible under the law of
parties.  In his fourth issue, he
challenges the sufficiency of the evidence to support his theft conviction,
individually or under the law of parties, claiming there was insufficient evidence
that he committed the offense or that the value of the stolen golf cart
exceeded $1,500.  In his fifth and sixth
issues, he argues that the evidence is insufficient to support his burglary
convictions because it did not show that the trailers that were burglarized
were “habitations.”  In his seventh,
eighth, and ninth issues, Harralson argues that the trial court erred by not
charging the jury on the lesser-included offense of theft in each of his three
burglary cases.  

          Because
we find that the evidence is sufficient and that the court properly charged the
jury, we affirm.

Background

          Jamaica
Beach Police Department Officer M. Todaro was working
the midnight shift, patrolling the highway, residential areas, and beachfront
in Galveston County.  At approximately
3:00 a.m. on September 3, 2009, he saw a tan-colored Ford Explorer speed past
him driving more than 80 miles an hour in a 35 miles-per-hour zone.  As the car turned, Todaro
saw its headlights come on.  Todaro chased the vehicle, and when he caught up to it, he
found it stopped in a ditch.  When Todaro approached the vehicle, the front passenger door was
open and a man later identified as Willy Davis was sitting in the driver’s
seat, holding his hands out the window. 
Inside the vehicle, Todaro saw “lots of
articles, like you would see in someone’s garage, kind of just thrown . . .
between the seats, front two seats and into the back of the truck that didn’t
appear to have been stacked neatly.”  Todaro suspected there had been another person in the car
because he saw two drinks covered in condensation.  After Davis was arrested, Todaro
assisted another law enforcement officer in searching the neighboring state
park for a second suspect.  

          Galveston
Police Department Officer B. Johnson was also working the midnight shift,
patrolling the west end of Galveston Island. 
At 3:18 a.m., he received a report about a burglary in progress on
Shaman Road in Indian Beach, which is just west of Jamaica Beach.  The police dispatcher informed Johnson that
the concerned neighbor who had reported the burglary was following the
suspects.  Officer Johnson came upon
Officer Todaro and the stopped Ford Explorer.  He later learned that the neighbor who
reported the burglary stopped following the Explorer when he saw Officer Todaro begin to chase it. 
Johnson helped Todaro arrest Davis, and then
he went to the house on Shaman Road.  The
Shaman Road house, which appeared unoccupied, was on stilts, and “there was a
lot of property” under the house. 
Officer Johnson helped Galveston Police Department Officer Atchley
identify and collect the property that had been stored beneath the house.

          Officer
Atchley, who was trained as a field identification officer, was about a mile
away from the Shaman Road house when he overheard the report of a burglary in
progress, so he went there to assist the other officers.  The neighbor who had made the report and
followed the Explorer until the police began chasing it saw Officer Atchley and
showed him to the house on Shaman Road. 
Atchley saw property under the house and two golf carts alongside it.  He thought it was unusual for the property to
be left under the house “because nobody would leave that stuff out.”  Atchley testified that he regularly patrolled
this neighborhood and that he had never before seen property under the house or
golf carts beside it.  Atchley said, “That
house was usually vacant.”

          Atchley
took photographs of the property at the Shaman Road house and the inside of the
Ford Explorer.  He also spoke with Joe Raley, who reported that someone had burglarized his
trailer and shed at a nearby Jamaica Beach trailer park called “Texas Campgrounds,”
which was located across a vacant field from the house at Shaman Road.  Atchley also
photographed Raley’s trailer and shed.  In addition, he helped to secure and collect
the evidence, which, he testified, included two golf carts, sporting equipment,
tools, electronics, and other household items. 
He testified that he found two identical pairs of black and red gloves,
which were shown in the photographs.  One
pair of gloves was found in the truck and the other was under the Shaman Road
house.  At trial, the State introduced
photographs of the property found under the Shaman Road house and in the Ford
Explorer.

          Galveston
Police Officer S. Hirst was working the morning shift
on September 3, 2009, when he received reports of multiple burglaries at Texas
Campgrounds.  He went to the park and
photographed three trailers—at lots numbered 109, 110, and 141.  Photographs showing the forced entries and the
inside areas of those trailers were introduced at trial.  Hirst testified
that he dusted for fingerprints in two trailers.  C. Pearson, who operates the Automated
Fingerprint Identification System for the City of Galveston Police Department,
testified that none of the fingerprints matched Harralson’s, but she said that
no match would be expected if the burglar wore gloves because no fingerprints
would be left behind.  

          Meanwhile, after Harralson
fled from the Ford Explorer, he placed several phone calls.  Cassie Marsh testified that, at different
times, she had dated both Davis and Harralson. 
She testified that she recognized Harralson’s voice on the telephone and
that he called her just before 7:00 a.m. on the morning of September 3,
2009.  Harralson told her that he was in
Galveston, that he and Davis had been pulled over, that Davis went to jail while
he ran, that there were stolen items in the vehicle,
and that he needed money to post bond for Davis.  On cross-examination, she conceded that when
the defense attorney called her before trial, she did not provide this
information and denied having any knowledge of the situation at all.  However she explained why she did so, saying,
“I told you I don’t know anything because I did not know who I was talking to. .
. . I didn’t want to put my business out because I did not know who I was . . .
talking to until at the end of the conversation that me and you had, you told
me who you were.”  She said she had not
spoken to either Davis or Harralson since September 3, 2009.  

          Debra
Dawson testified that in September 2009 Harralson had been dating her daughter
for approximately two months.  Early in
the morning on September 3, 2009, she received a phone call from
Harralson.  Phone records admitted at
trial showed a call from Harralson’s mobile phone to Dawson at 3:22 a.m.  She testified that she was positive that the
phone call came from him because she recognized his voice.  Harralson told her he was stranded and needed
a ride.  Dawson woke her daughter, and they
drove to meet Harralson, staying in telephone contact with him along the
way.  Over the course of many phone
calls, Harralson told Dawson and her daughter that he had been with Davis, they
had an argument, he got out of the car, and he got stranded.  She picked him up on the side of a road, and
they drove back to Dawson’s house without much further conversation.

          Pam
Cameron, Davis’s mother, testified she received a phone call from Harralson
between 6:30 and 7:00 a.m. on September 3, 2009.  She testified that he told her what happened
in Galveston:

When he called, he told me,
he said, “Aunt Pam, me and [Davis] got pulled over.  And when we got pulled over”—he said [Davis]
put his hands outside the window and he got out on the passenger’s side, jumped
out, and took off into the bushes.

 

          . . . .

 

He said he was watching the [police
officer] arrest [Davis] . . . .  And when
he turned after—you know, when he was arresting my son, he was watching through
the bushes what he was doing.  He put my
son in the back of the police car.  Then
they put his Blazer or whatever that was on wrecker.

          

.
. . .

          

He was just telling me—oh,
yeah, and he told [Davis] he should have took off and
ran with him.  He told [Davis] he should
take off and run with him and leave the car and report it stolen.

          

.
. . .

          

They had some stolen
equipment in there. . . . He said it was their stuff that they stole in
Galveston. . . . He did say he was wearing gloves . . . .

          

.
. . .

          

He said he was wearing
gloves because they couldn’t track no fingerprints
with gloves. 

 

Cameron testified that Harralson called her several
times that day, telling her almost the same thing each time he called.  She said he asked her for money to post bond
for Davis, but she did not give it to him. 


Gracie Crowe testified that she was
a close family friend of Cameron’s and that she was with Cameron on September
3, 2009, when Cameron received phone calls from Harralson.  She said she heard one conversation on speakerphone
in which Harralson said that he ran when they were pulled over and he was later
picked up by Dawson and her daughter.

          Back
on the island, Galveston Police Department Detective J. Chide began his shift
at 8:00 a.m. on September 3, 2009.  Some
of the officers involved in the case informed him that a burglary suspect had
been arrested, a second suspect had fled, and some stolen property had been
recovered.  Detective Chide looked at the
recovered property and, based on the amount of property he saw, suspected that
more burglaries would be reported.  He
testified:

During the course of that
morning, people were waking up and they were finding that, you know, their
trailer was broken into or golf carts stolen. 
Then it was kind of an area, campground area, west end of Galveston, and
then other people started looking and notifying their neighbors, you know to
check and see if property was stolen. 
The officers were dispatched to that area and started taking numerous
reports of burglaries and thefts.

 

          Complainant
Brian Batcheller learned about the burglaries from a neighbor and a cousin who
had trailers at the Texas Campgrounds. 
Batcheller lived in League City, and he kept a travel trailer at lot 110
at the Texas Campgrounds.  He testified
that he and his family “usually come down on the weekends and spend the entire
weekend.”  Batcheller had tools in his
trailer at that time to rebuild what was destroyed by Hurricane Ike.  When he learned about the burglaries, he drove
to Galveston to check on his trailer.  Upon
his arrival, he noticed that the door latch had been pried, that glass and a
screen had been broken, and that there was glass all over the deck.  He also discovered that his tools were
gone.  He said:

I had several tools in there
that I had—like I say, I was trying to rebuild everything and all my tools were
gone.  I noticed—I had them stacked on
the floor when you walk in and they were gone. 
And there’s some drawers—I think there might
have been a couple of drawers pulled out and one of the closets might have been
opened.  I mean I knew then that somebody
had been in there.

 

.
. . .

 

I had a couple of fans, they
were gone.  They were in the back part of
the trailer.  So it wasn’t just one
area.  They went through the whole
trailer.

 

. . . .

 

I had a DeWalt
combination set which includes a drill, a saw, a
light.  Some other
items in the combination kit.  I
had a sawzall. 
I had a drill.  I had a bag of
tools that had all my electrical test equipment in there along with wrenches
and other pieces of equipment.  I had a
socket set, flashlights, things that you would need to rebuild what I had to
rebuild out there.  Probably—I don’t know
if it’s relevant—but about $2,000 worth of hand tools roughly.  A battery charger for my
golf cart.  About
$500 worth of battery charger.  .
. . [And] a Maglite flashlight . . . .

 

When he was shown a photograph of some of the
property that was found under the Shaman Road house, he identified his tools,
his fans, and his battery charger.  He
testified that he recovered his property from the police station, but one of
his fans was badly damaged.  He also
testified that he was at his trailer four days before the burglary and that he
had not given anyone, including Harralson or Davis, permission to enter his
trailer.  

Complainant John Ginn testified that he lived five days a week in his
trailer, which he kept at lot 109 at the Texas Campgrounds.  Ginn said that in
September 2009 he primarily lived in Huntsville, but he and his family came to
Galveston and stayed in his trailer as often as they could.  He said that there had been a fence between
the campgrounds and Indian Beach, but the fence was destroyed by Hurricane Ike
and not in existence in September 2009.  

Ginn was on his
way to the campgrounds, and he learned that his trailer had been burglarized
only after he arrived.  He testified:

When I came down, the police
were actually there investigating a burglary at Brian Batcheller’s
trailer which is across the street from mine. 
And so, you know, they had told me what was going on when I drove
up.  And then when I went over and
checked my trailer, the door was unlocked and somebody had been in.

 

.
. . .

 

Well, as soon as you go in
my trailer—well, I mean, they’re all little—but just to the right of the door
is the TV and the TV was gone.  All the
doors were open, all the drawers were open. 
So somebody had been in there obviously looking.

 

.
. . .

 

Once I started looking, I
was missing a rod and reel and a hunting knife and the remotes to my DVD player
and my TV and antenna-box thing.  So all that was what I noticed missing the first day.

 

.
. . .

 

The TV was [worth] about
$350 and the rod and reel was like a hundred twenty-five, a hundred dollars,
something like that with tax.  And the
hunting knife was about a hundred dollars.

 

When he was shown a photograph of some of the
property that was found under the Shaman Road house, he identified his
television.  He testified that he
recovered only his television from the police station.  He also testified that he was at his trailer
a few days before the burglary and that he had not given anyone, including
Harralson or Davis, permission to enter his trailer.  

Complainant Mary Mach lived in Spring, and she kept a trailer at lot 141 at the Texas
Campgrounds.  She testified that this was
her family’s vacation home, which they used frequently in the summer and
occasionally in the winter.  On September
3, 2009, “[w]e got a phone call from the maintenance man in Galveston telling
us that our place had been broken into.” 
She and her daughters had been planning to go to Galveston, so they left
immediately to inspect their trailer.  At
trial, Mach identified her trailer door from a photograph, which showed signs
of forced entry.  Mach testified that it
looked like “[o]ur trailer got broken into.”  “It looked someone had been in there.  There were things placed in different areas
that weren’t when we left.  There were
things missing.”  She testified that her
iPod docking station, some of her husband’s tools, and keys to their golf cart,
the swimming pool, and the clubhouse were missing from her trailer.  She also testified that some fishing poles
were missing from their shed.  Mach said
that a neighbor returned the keys to her golf cart, which he found in his golf
cart, which was also stolen.  

When she was shown photographs of
some of the property that was found under the Shaman Road house, she identified
her iPod docking station and fishing poles. 
She testified that the fishing poles were new and had been a gift from
her father.  She did not know how much
the fishing poles were worth.  She
testified that she recovered the fishing poles and the iPod docking station
from the police station, but the iPod docking station was damaged.  She also said that she had not given anyone,
including Harralson or Davis, permission to enter her trailer.  

Complainant John White testified
that he worked in Deer Park as a police officer and kept a trailer at the Texas
Campgrounds as his family’s vacation home. 
On September 3, 2009, White received a phone call from a Texas
Campgrounds employee who informed him that his golf cart had been stolen and
was at the police impound in Galveston.  White drove to Galveston to claim his golf
cart.  He said his golf cart was black
and red and “pretty distinctive.”  He
testified that he custom-built much of it himself.  Though he paid only $300 for the golf cart,
he estimated that with the time and materials he put into it, it was worth
approximately $2,000.  White said that he
did not know Harralson or Davis and did not give them permission to take his
golf cart.  White testified that he
recovered his golf cart, but it was damaged. 


At trial, Detective Chide said that
the dispatched police officers had been asked to get a good description of what
property was missing so that it could be identified with the property that was
already at the police station.  Chide
testified that all of the property recovered from the Explorer and the Shaman
Road house was identified as stolen property. 


With Davis in police custody, Chide
turned his attention to finding the second suspect.  Chide spoke with seven people, including
relatives and friends of Davis and Harralson. 
He spoke to Harralson, who told him that he was not in Galveston at the
time of the burglaries.  But at trial,
the State introduced mobile phone records showing that calls made from
Harralson’s phone just after Davis was arrested were routed through cellular
towers in the Galveston area, and witnesses testified that Harralson called
them at the times the phone records showed Galveston-area cellular tower
usage.  

One of the people with whom Chide
spoke was Tommy Foulk.  Chide testified that Foulk
was reluctant to speak with him but provided some good information.  Foulk testified at
trial.  Foulk,
who is Davis’s cousin, said that he and Harralson were close friends, like
brothers.  But Foulk
denied having spoken to Harralson about any connection to the burglaries and he
denied telling Detective Chide about any such conversation.  In testimony presented to impeach Foulk’s denial of having provided information to him, Chide
testified:

Mr. Foulk
said he would tell me what [Harralson] told him and what happened in Galveston
but he would only tell me and he wouldn’t tell anyone else.  And if anyone asked him, he would deny it.

 

.
. . .

 

Mr. Foulk
stated that [Harralson] had told him that he had ran from [Davis’s] Explorer, Ford Explorer when the police pulled
them over in Galveston. He told me that he had hid in a second-story balcony of
a beach house and watched the police as they were looking for him.

 

.
. . .

 

He continued to say that
[Harralson] told him that he had stolen stuff in [Davis’s] vehicle and some of
the stuff—some more stuff was under a beach house.  And [Harralson] told him that he and [Davis]
went to Galveston; they had some bikes; they were going to ride around; and
they found a golf cart and then another golf cart; and they started riding
around and they saw a shed open and got some fishing poles and tools and
brought some of the stuff under the beach house.  

 

          Based
on his investigation, Chide identified Harralson as the second suspect.  Harralson was arrested and charged in three
cases for burglary and in two cases for felony theft.  After the State rested, the trial court
granted Harralson’s motion for directed verdict as to one of the theft charges.
 Harralson rested without introducing any
additional evidence.  At the charge
conference, Harralson sought to have the jury charged on the lesser-included
offense of theft in each of the burglary cases, and the trial court denied his
request.  The jury found Harralson guilty
in each burglary case and in the theft case. 
The trial court found the enhancement provision in the indictment true,
and it assessed punishment at 17 years in prison for each burglary and 2 years
in prison for the theft conviction. 
Harralson appealed, raising six issues challenging the sufficiency of
the evidence and three issues challenging the trial court’s denial of his
request to charge the jury on the lesser-included offense of theft.

I.              
Sufficiency of the evidence

A.            
Standard of review

In reviewing the legal sufficiency
of the evidence to support a criminal conviction, a court of appeals will determine
“whether, after viewing the evidence in the light most favorable to the
prosecution, any rational trier of fact could have found the essential elements
of the crime beyond a reasonable doubt.”  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).
 Our review of the evidence includes
evidence that was properly and improperly admitted.  Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).
 As the exclusive judge of the facts, the
jury may believe or disbelieve all or any part of a witness’s testimony.  Chambers v. State, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).
 We presume that the fact finder resolved
any conflicting inferences in favor of the verdict, and we defer to that
resolution.  See Jackson, 443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778.  On appeal we may not re-evaluate the weight
and credibility of the record evidence and thereby substitute our own judgment
for that of the fact finder.  Williams v. State, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).
 In reviewing the evidence, circumstantial
evidence is as probative as direct evidence in establishing the guilt of an
actor, and circumstantial evidence alone can be sufficient to establish guilt. Hooper v. State, 214
S.W.3d 9, 13 (Tex. Crim. App. 2007).

B.            
Detective Chide’s testimony

As a preliminary issue, Harralson
argues that Detective Chide’s testimony was admitted
only to impeach Foulk and, therefore, it must be
disregarded in this Court’s sufficiency review.  When evidence is admissible for one purpose
such as impeachment, but not all purposes, a defendant may request a limiting
instruction to restrict the evidence to its proper scope.  See Tex. R. Evid. 105(a).
 When such a limiting instruction is
given, “[t]estimony admitted only for impeachment
purposes is without probative value and cannot be considered in determining the
sufficiency of the evidence to support the conviction.”  Goodman
v. State, 665 S.W.2d 788, 792 & n.2 (Tex. Crim. App. 1984) (citing Key v. State, 492 S.W.2d 514, 516 (Tex. Crim.
App. 1973)).  However, “[a] failure to
request a limiting instruction at the time evidence is presented renders the
evidence admissible for all purposes and relieves the trial judge of any
obligation to include a limiting instruction in the jury charge.”  Williams
v. State, 273 S.W.3d 200, 230 (Tex. Crim. App. 2008) (citing Hammock v. State, 46 S.W.3d 889, 892
(Tex. Crim. App. 2001)).

Harralson objected to Chide
testifying about what Foulk told him on the grounds
that it was hearsay.  The trial court
overruled the objection, observing that Chide was called to impeach prior
testimony of a witness.  The trial court did
not instruct the jury that Chide’s testimony was
being offered only for a limited purpose, and Harralson did not request a
limiting instruction.  Because there was
no limiting instruction and no request for a limiting instruction, Chide’s testimony was admitted for all purposes and may be
considered in this Court’s sufficiency review. 
See Williams, 273 S.W.3d at 230.

C.            
Burglary of the trailers

Harralson brings five issues
pertaining to his three convictions for burglary of a habitation.  In his first three issues, he argues that the
evidence is insufficient to show that he committed the burglaries or that he
could be held liable under the law of parties. 
In his fifth and sixth issues, he argues that the evidence was
insufficient to show that Batcheller’s and Ginn’s trailers were habitations.  Harralson’s brief included no argument that
Mach’s trailer did not qualify as a habitation.

A person commits burglary of a
habitation “if, without the effective consent of the owner, the person enters a
habitation . . . with intent to commit a felony, theft, or an assault.”  Tex. Penal Code Ann. § 30.02(a) (West
2003).  A person
commits a theft if “he unlawfully appropriates property with intent to deprive
the owner of property.”  Id. § 31.03(a) (West
Supp. 2009). Appropriation of property is unlawful if it is without the
owner’s effective consent.  Id. § 31.03(b)(1).

The State must prove beyond a
reasonable doubt that the defendant is the person who committed the charged
offense.  Johnson v. State, 673 S.W.2d 190, 196 (Tex. Crim. App. 1984); Smith v. State, 56 S.W.3d 739, 744 (Tex.
App.—Houston [14th Dist.] 2001, pet. ref’d).  But “the law in Texas allows individuals . . . to
be held criminally responsible for the conduct of another when that individual
acts in concert with another person in committing an offense.”  Powell
v. State, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006); see Tex. Penal
Code Ann. §§ 7.01–.02 (West 2011).
 “Circumstantial evidence alone may be
used to prove that a person is a party to an offense.”  Powell,
194 S.W.3d at 506 (citing Beardsley v.
State, 738 S.W.2d 681, 684 (Tex. Crim. App. 1987)).  Furthermore, an individual can be guilty of
burglary of a habitation even though he does not personally enter the
burglarized premises if he is acting together with another in the commission of
the offense.  Powell, 194 S.W.3d at 506–07.

1.             
Harralson’s participation in the burglaries

In his first three issues,
Harralson contends there is no evidence that he personally entered the trailers
owned by Batcheller, Ginn,
and Mach.  He argues that evidence that
he fled from the Ford Explorer which contained the stolen property was
insufficient to support an inference of guilt. 
He argues that there is no evidence connecting him to the property found
under the Shaman Road house.  He also
contends that there is no evidence that he is guilty as a party because there is
no direct evidence that he assisted Davis in committing the burglaries or that
he agreed to do so.  He argues that the
circumstantial evidence does not prove his participation in this crime, only
his mere presence.

The evidence showed that Harralson
was in Galveston with Davis at the time of the burglaries and that Harralson
told several people about his involvement in the burglaries.  Specifically, Debra Dawson testified that
Harralson called her just after 3:00 a.m. on September 3, 2009, and that she
and her daughter picked him from the side of the road in Galveston after he had
told them he was stranded there.  Cassie
Marsh testified that around 7:00 a.m. on that same morning, Harralson called
her and told her he was in Galveston, that he and Davis had been pulled over,
that there was stolen property in the vehicle, and that he fled the car.  Pam Cameron testified that Harralson called
her, told her that he and Davis were pulled over, that he fled the vehicle on
foot because the vehicle contained property “that they stole in Galveston,” and
that he had worn gloves to avoid leaving fingerprints.  Gracie Crowe testified similarly, saying that
she overheard a conversation between Harralson and Cameron on the
speakerphone.  Chide testified that Tommy
Foulk told him that Harralson said he and Davis “had
stolen stuff” in Davis’s vehicle and under a house in Galveston and that he
fled from police when the vehicle was pulled over.  In addition, the State introduced mobile
phone records, which showed that calls made from Harralson’s phone on the
morning of the burglaries were routed through Galveston-area cellular
towers.  

Other circumstances connecting
Harralson to the crime include the evidence that a concerned neighbor reported
a burglary in progress, followed Davis’s vehicle until the police began to
pursue it, and then led other police officers to the house at Shaman Road, where
the stolen property had been stashed.  The
burglaries all occurred at the Texas Campgrounds, which was close to the Shaman
Road house.  Batcheller,
Ginn, and Mach all identified their stolen property
in photographs showing what was stashed under the Shaman Road house.  And photographs of the house and the car
showed identical pairs of gloves, consistent with Pam Cameron’s testimony that
Harralson said that they wore gloves so that there would be no fingerprints
left behind.

Finally, Batcheller,
Ginn, and Mach each testified that they had not given
Davis or Harralson permission to enter their trailers.  Evidence introduced at trial, including
photographs, showed signs of forced entry, including broken glass and damaged
doorjambs and locks.  

Viewing the evidence in the light
most favorable to the prosecution, we conclude that a rational jury could have
found beyond a reasonable doubt that Harralson acted alone or in concert with
Davis to enter the trailers owned by Batcheller, Ginn, and Mach and to take their property without their
consent.  See Jackson, 443 U.S. at
319, 99 S. Ct. 2781 at 2789; see also Tex. Penal Code Ann. §§ 30.02, 31.03.  We hold that the evidence is legally
sufficient in this respect to support the burglary convictions, and we overrule
Harralson’s first three issues.

2.             
The trailers’ status as “habitations”

In his fifth and sixth issues,
Harralson argues that there is no evidence to show that Batcheller’s
and Ginn’s trailers were habitations.  A “habitation” is “a structure . . . that is
adapted for the overnight accommodation of persons.”  Tex. Penal Code Ann. § 30.01(1).
 In this context, “adapted” means
“suitable.”  Blankenship v. State, 780 S.W.2d 198,
209 (Tex. Crim. App. 1989). 

The most significant element
of the definition is the adaptation “for the overnight accommodation of
persons.”  “What makes a structure
‘suitable’ or ‘not suitable’ for overnight accommodation is a complex,
subjective factual question fit for a jury’s determination.”  The jury may look to a host of considerations
such as the contents of the structure, including bedding, electricity,
plumbing, or furniture; the jury may also look to and consider the type of
structure and its typical use as a means for overnight accommodation.  

 

Salazar v.
State, 284 S.W.3d 874, 877 (Tex. Crim. App. 2009) (footnotes omitted, quoting Tex. Penal Code Ann. §
30.01(1) and Blankenship, 780 S.W.2d
at 209–10).  Each factor
is relevant; none is essential or necessarily dispositive.  Blankenship,
780 S.W.2d at 209.  A jury’s determination that a burglarized
place was a habitation will not be overturned on appeal unless the appellant
can demonstrate that no reasonable trier of fact could have found that the
structure was a habitation.  See id.

          Batcheller testified that he lived in
League City but that he and his family usually stayed overnight in the
trailer.  He said they “usually come down
on the weekends and spend the entire weekend.” 
Ginn testified that in 2009, he and his family
used the trailer as a second home or a vacation home, but he said that at the
time of trial, he was living there five days a week.  In addition, the State introduced photographs
showing the trailers from the inside and the outside.  The pictures showed beds, other household
furniture and items, permanent decks built alongside the trailers, and
food.  Viewing the evidence in the light
most favorable to the prosecution, we conclude that a rational jury could have
found beyond a reasonable doubt that Batcheller’s and
Ginn’s travel trailers were suitable for the
overnight accommodation of people.  See Jackson, 443 U.S. at 319, 99 S. Ct. at
2789; Salazar, 284 S.W.3d at 877.  We hold that the evidence is legally sufficient
to show that the trailers in question were habitations, and we overrule
Harralson’s fifth and sixth issues.

D.            
Theft of the golf cart

In his fourth issue, Harralson
argues that the evidence is legally insufficient to show that he committed
theft because there were no fingerprints on John White’s golf cart, and the
fact that it was found under Shaman Road with the other stolen property is
insufficient to support the conviction. 
In addition, Harralson argues that there is insufficient evidence that the
golf cart was worth $1,500 or more.  A
person commits theft if he unlawfully appropriates property with the intent to
deprive the owner of the property.  Tex. Penal Code Ann. § 31.03(a).  Theft is a state jail felony if the value of
the stolen property is more than $1,500 but less than $20,000.  Id. § 31.03.  

As we have noted, there is some
evidence that Harralson wore gloves in the commission of the crimes, which, if
credited by the jury, would have provided an explanation for the lack of
fingerprints on the golf cart.  In
addition to the circumstantial evidence that we have already said is legally
sufficient to hold Harralson criminally responsible for the three burglaries,
there is also evidence pertaining to the golf carts.  Specifically, Detective Chide testified about
what Foulk told him. 
Chide testified that Harralson told Foulk that he and Davis were riding bicycles around
Galveston and they found two golf carts and “then they started riding
around.”  With the other circumstantial
evidence, including the fact that White’s golf cart was found at the Shaman
Road house with the other stolen property, and viewing the evidence in the
light most favorable to the prosecution, we conclude that a rational jury could
have found beyond a reasonable doubt that Harralson acted alone or in concert
with Davis to steal the golf cart.  See Jackson,
443 U.S. at 319, 99 S. Ct. at 2789.

Harralson also complains about the
proof of the golf cart’s value.  The
Penal Code establishes how the value of stolen property is to be determined for
the purpose of a theft offense.  Tex. Penal Code Ann. § 31.08 (West 2011).  Under the Penal Code, value is either “(1)
the fair market value of the property or service at the time and place of the
offense; or (2) if the fair market value of the property cannot be ascertained,
the cost of replacing the property within a reasonable time after the theft.”  Id.  John White testified that his golf cart was
distinctive.  He said, “It’s the only one
in the whole campground that looks like it does because I’ve custom-built a lot
of it myself.”  He testified about its
value and the replacement cost, saying that he believed it was worth
$2,000.  “I bought it used; but, you
know, when you go to buy one, shop to buy one, you can seldom find one that
runs and is operational for less than $2,000.” 
On cross-examination, he testified that it was a 1987 Easy Go Marathon
model golf cart.  He said that he paid
$300 for it, but he said, “I bought it from a person on Craigslist and it was
in far worse shape than it’s in now.  I put brand-new batteries in it.” 

          Viewing
the evidence in the light most favorable to the prosecution, we conclude that a
rational jury could have found beyond a reasonable doubt that White’s golf car
had a fair market value of $2,000 based upon White’s testimony, or that due to
its customization, its fair market value could not be determined and that it
would cost $2,000 to replace it with a functioning golf cart.  See Sullivan
v. State, 701 S.W.2d 905, 908–09 (Tex. Crim. App. 1986) (“It has long been
the rule in this State that the owner of property is competent to testify as to
the value of his own property. . . . When an owner testifies, the presumption
must be . . . that the owner is testifying to an estimation of the fair market
value.”); see also Tex. Penal Code Ann. § 31.08.  We hold that the evidence is legally
sufficient to show that the value of the stolen property was more than
$1,500.  We overrule Harralson’s fourth
issue.

II.           
Lesser-included offense

In his seventh, eighth, and ninth
issues, Harralson contends that the trial court erred by denying his request to
charge the jury on the lesser-included offense of theft as to each of his
burglary charges.

An offense qualifies as a
lesser-included offense of the charged offense if: (1) it is established by
proof of the same or less than all the facts required to establish the
commission of the offense charged; (2) it differs from the offense charged only
in that a less serious injury or risk of injury to the same person, property,
or public interest suffices to establish commission of the offense; (3) it
differs from the offense charged only in that a less culpable mental state
suffices to establish its commission; or (4) it consists of an attempt to commit
the offense charged or an otherwise included offense.  Tex. Code Crim. Proc. Ann. art.
37.09 (West 2004). 
To determine whether a defendant is entitled to an instruction on a
lesser-included offense, the court conducts a two-pronged test.  See Ex parte Watson, 306 S.W.3d 259, 272–73 (Tex. Crim. App. 2009);
Hall v. State, 225 S.W.3d 524, 535–36
(Tex. Crim. App. 2007).  The first
prong of the test requires the court to use the “cognate pleadings” approach to
determine whether an offense is a lesser-included offense of another offense.  The first prong is satisfied if the indictment
for the greater-inclusive offense either: “(1) alleges all of the elements
of the lesser-included offense, or (2) alleges elements plus facts
(including descriptive averments, such as non-statutory manner and means, that are alleged for purposes of providing notice)
from which all of the elements of the lesser-included offense may be deduced.”  Watson,
306 S.W.3d at 273. 


Both statutory elements and
any descriptive averments alleged in the indictment for the greater-inclusive
offense should be compared to the statutory elements of the lesser offense. If
a descriptive averment in the indictment for the greater offense is identical
to an element of the lesser offense, or if an element of the lesser offense may
be deduced from a descriptive averment in the indictment for the
greater-inclusive offense, this should be factored into the
lesser-included-offense analysis in asking whether all of the elements of the
lesser offense are contained within the allegations of the greater offense.

 

Id.  This inquiry is a question of law.  Hall,
225 S.W.3d at 535.

The second prong asks whether there
is evidence that supports giving the lesser-included-offense instruction to the
jury.  Id. at 536.  A
defendant is entitled to a requested instruction on a lesser-included offense
when the proof for the charged offense subsumes the proof required to establish
the lesser-included offense and some evidence in the record would permit a
rational jury to find that if the defendant is guilty, he is guilty only of the
lesser-included offense.  Id. Anything more than a scintilla of
evidence may be sufficient to entitle a defendant to a lesser charge.  Id.  A lesser-included-offense instruction is
required when the evidence establishes the lesser-included offense as a valid,
rational alternative to the charged offense.  Id.

          Although
theft can be a lesser-included offense of burglary, see Phillips v. State, 178 S.W.3d 78, 82 (Tex. App.—Houston [1st
Dist.] 2005, pet. ref’d), Harralson
has not satisfied the second prong of the test, which requires that the record
show that some evidence would permit the jury to find, rationally, that if
Harralson is guilty, he is guilty only of the lesser offense.  See Hall,
225 S.W.3d at 536. 
The evidence showed that Harralson and Davis acted together, that the
stolen property was inside locked trailers that were forcibly entered, and that
the owners of the property did not consent to Harralson or Davis entering the
trailer or possessing the property. 
Though it was within the jury’s province to believe or disbelieve the
evidence that was presented, “it is not enough that the jury may disbelieve
crucial evidence pertaining to the greater offense, but rather, there must be
some evidence directly germane to the lesser-included offense for the finder of
fact to consider before an instruction on a lesser-included offense is
warranted.”  Hampton v. State, 109 S.W.3d 437, 441
(Tex. Crim. App. 2003).  

          Harralson
argues that the trial court should have charged the jury on his requested
lesser-included offense based solely on the weakness of the evidence to support
a burglary conviction.  That is not the
law.  See
id.  He further argues that there was
evidence that he and Davis had a disagreement that led to his leaving the
vehicle and that there was no evidence about when Harralson left the vehicle
because of the disagreement.  Thus,
Harralson argues that the jury could have believed that there was an agreement
to commit theft but a disagreement about whether to commit burglary.  But the evidence at trial was that Harralson
left the vehicle after Davis pulled over when the police were chasing them.  The stolen property was already in the vehicle
at this time.  There is no evidence that
Harralson disagreed about committing burglary and only possessed the stolen
property after Davis committed burglary by himself.  

There is no evidence in the record
in this case suggesting that if Harralson is guilty, he is guilty only of theft
and not of burglary.  See Hall, 225 S.W.3d
at 536.  Harralson has not shown
that he was entitled to a lesser-included offense instruction.  See id.  We overrule Harralson’s seventh, eighth, and
ninth issues.

Conclusion

          We affirm the judgments of
the trial court.

 

 

                                                                      Michael
Massengale

                                                                      Justice


 

Panel
consists of Justices Jennings, Massengale, and Huddle.

Do not
publish.   Tex. R.
App. P. 47.2(b).